**In re MMG LLC, Debtor in Foreign Proceedings.**

**No. 00 B 42476(SMB).**

United States Bankruptcy Court, S.D. New York.

Dec. 26, 2000.

Cadwalader, Wickersham & Taft, Ken Coleman, Ingrid Bagby, of counsel, New York City, for petitioners.

Baer Marks & Upham LLP, Jay L. Gottlieb, Gerard S. Catalanello, of counsel, New York City, Williams & Connolly, LLP, Paul Martin Wolff, David M. Zinn, Marcie R. Ziegler, of counsel, Washington, DC, co-counsel to Matthew Stewart.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART THE LIQUIDATORS' MOTION FOR A PRELIMINARY INJUNCTION AS TO MATTHEW STEWART

STUART M. BERNSTEIN, Chief Judge.

Following the commencement of a Cayman Islands winding up proceeding, the joint provisional liquidators (the "Liquidators") appointed by the Cayman Islands court commenced this ancillary case under 11 U.S.C. § 304. They now seek, *inter*

*alia,* a preliminary injunction against the commencement or continuation of litigation against the debtor in the United States. Only one creditor, Matthew Stewart, opposes the motion. For the reasons discussed below, their motion is granted except to the extent that Stewart may commence or continue an arbitration proceeding for the purpose of liquidating his claim.

## BACKGROUND

The debtor, MMG LLC, was incorporated in the Cayman Islands in 1994, (*Petition Pursuant to Section 304 of the Bankruptcy Code to Commence a Case Ancillary to Foreign Proceedings,* dated Nov. 2, 2000 ("*Petition*"), at ¶ 5), but apparently maintained a place of business in New York. It provided management consulting advice on a variety of business issues to its clients, a list that included many Fortune 100 companies. (*Petition* ¶ 7; *First Affidavit of Ulrik Philipson,* sworn to Nov. 1, 2000 ("*Philipson Affidavit*"), ¶ 5.) In September 1999, MMG sold its operating subsidiaries to USWeb Corporation. (*Petition* ¶ 8; *Philipson Affidavit* ¶ 6.) In exchange, it received USWeb stock and cash on the closing date, and also became entitled to receive two additional tranches of USWeb stock on September 3, 2000 and September 3, 2001. (*Petition* ¶ 8; *Philipson Affidavit* ¶¶ 7–8.) In March 2000, USWeb was acquired by marchFIRST Inc., and as a result, the two tranches became payable in marchFIRST stock. (*Petition* ¶ 9; *Philipson Affidavit* ¶¶ 10–11.)

Following the sale, MMG ceased operations; since then, its only activity has involved receiving the distributions of marchFIRST stock, paying its debts and distributing the balance of the stock to its shareholders and former shareholders. (*Petition* ¶ 10; *Philipson Affidavit* ¶ 12.)

After repaying $40 million of a $60 million loan made by PNC Bank, (*Petition* ¶ 11; *Philipson Affidavit* ¶ 14), MMG still owed approximately $30 million to the PNC Bank, its other creditors and its shareholders. (*See Petition* ¶ 10; *Philipson Affidavit* ¶ 13.) It retained 1.2 million shares of marchFIRST stock to pay its obligations, and distributed the balance to its shareholders (except for Stewart and possibly one other). (*See Petition* ¶ 17; *Philipson Affidavit* ¶ 16.)

The amount of stock retained seemed to be sufficient at the time, but eventually proved too little. At the end of 1999 or early 2000, the marchFIRST stock traded on the NASDAQ at $80 per share. By September 2000, however, the stock had dropped to $20 per share, and by the end of October, the price had fallen to approximately $4.08 per share. (*See Petition* ¶ 12; *Philipson Affidavit* ¶¶ 18–21.) Thus, the 1.2 million shares declined in value from $24 million to approximately $4.9 million. As a result of the decline, MMG's combined cash and stock were worth approximately $18.5 million, (*Transcript of hearing,* held Nov. 13, 2000 ("*Tr.*"), at 7), leaving it "technically insolvent." (*Philipson Affidavit* ¶ 23.)

Stewart is a former founding shareholder of MMG. It appears that he was ousted against his will, and did not receive the distributions of marchFIRST stock at the time that MMG distributed the balance of the first two tranches to the other shareholders. He commenced arbitration proceedings in New York, and received awards in July 1999 and October 1999. Their net effect reinstated him as a shareholder and entitled him to participate in the marchFIRST stock.[1] The arbitration did not resolve all of the issues between the parties, and they contemplate additional proceedings.

---

1. MMG paid part of the award, although Stewart alleges that he has suffered additional damages because the payment was delayed. In addition, Stewart obtained the right to participate in something called the Founders Fund, but the value of that right remains to be determined.

### A. The Cayman Islands Proceeding

As a result of MMG's insolvency, it decided to seek relief in the Cayman Islands court. Facing potential personal exposure to creditors, the directors caused MMG to file a petition on November 1, 2000, for winding up by the Court pursuant to the Cayman Islands Companies Law §§ 94 *et seq.* MMG also sought immediate *ex parte* relief consisting of two prongs: the appointment of provisional liquidators to work with management to resolve MMG's problems in an orderly manner, (*see Philipson Affidavit* ¶ 27), and an immediate stay of creditor actions. On November 2, 2000, the Grand Court signed an *ex parte* order (the "Grand Court Order"), granting MMG all of the immediate relief that it requested. Among other things, the Grand Court Order

1. Appointed G. James Cleaver and Dan Scott of Ernst & Young as Liquidators;

2. Granted the Liquidators the power and duty to

   (a) oversee the debtor's existing business which was to remain under the control of the board of directors and the supervision of the court;

   (b) if appropriate, file an ancillary case or chapter 11 case in the United States Bankruptcy Court for the Southern District of New York;

   (c) sell the debtor's assets and borrow money on behalf of the debtor without further order of the Grand Court;

   (d) provide written reports to the Grand Court;

   (e) if appropriate, draft a scheme of arrangement under § 86 of the Companies Law;

   (f) liaise with creditors and shareholders; and

3. Stayed all actions and proceedings pursuant to § 99 of the Companies Law,[2] including passing any resolution to wind up the debtor, without leave of the Grand Court.

The debtor's aims are spelled out in the *Philipson Affidavit.* To repay the MMG liabilities in full, the price of the marchFIRST stock must rise to a point that renders the debtor solvent (Mr. Philipson estimates this to be in excess of $14.00 per share). (*Philipson Affidavit* ¶¶ 26, 30, 31.) Ideally, it wants to wait out the market without creditor interference, but recognizes that there are other possibilities. During the period of provisional liquidation,[3] the Liquidators and management intend to explore three options: (1) liquidate MMG if the marchFIRST share price does not rise sufficiently, (*Philipson Affidavit* ¶ 31), (2) discharge the petition if the financial situation improves, (*Locke Declaration* ¶ 5), or (3) implement a scheme of arrangement under § 86 of the Companies Law. (Grand Cayman Order ¶ (1)(i)). A premature winding up order will adversely affect the amount of marchFIRST stock distributed as part of the third tranche, allow PNC Bank to exercise set off rights at an unfavorable rate to the prejudice of the estate, and force the Liquidators to sell MMG's depressed portfolio of marchFIRST stock. (*Philipson Affidavit* ¶ 29.)

### C. The § 304 Proceeding

On November 3, 2000, the Liquidators commenced this § 304 proceeding. As is customary in this type of case, they re-

---

**2.** Section 99 states in pertinent part:
   The Court may, at any time after the presentation of a petition for winding up a company under this Law, and before making an order for winding up the company ... restrain further proceedings in any action, suit or proceeding against the company upon such terms as the Court thinks fit....

**3.** Provisional liquidation occurs after the winding up petition has been presented and the provisional liquidator has been appointed but before a winding up (*viz.*, liquidation) order has been made. (*Declaration of Guy Locke,* dated Nov. 2, 2000 ("*Locke Declaration*"), ¶ 5.)

quested and I issued a temporary restraining order staying United States litigation, and scheduling a preliminary injunction hearing. In support of their motion, the Liquidators contended that the factors set forth in 11 U.S.C. § 304(c) supported the issuance of an injunction, and while § 304 does not require them to show irreparable harm to obtain a preliminary injunction, they had nonetheless shown it.

Stewart interposed the sole objection to the preliminary injunction motion, and filed an answer to the petition on or about November 22, 2000. He raised two general arguments. First, the Cayman Islands proceeding was not a "foreign proceeding" as defined in the 11 U.S.C. § 101(23). Second, if it was, the factors enunciated under 11 U.S.C. § 304(c), which control the propriety of granting relief, did not support the request.

## DISCUSSION

■■■ Section 304 was designed to assist foreign representatives in administering the debtor's United States assets. *See, e.g., Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision, S.A.),* 961 F.2d 341, 348–49 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *Victrix S.S Co. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713–14 (2d Cir.1987); *Cunard S.S. Co. v. Salen Reefer Services A.B.,* 773 F.2d 452, 454–55 (2d Cir.1985). In applying its principles, courts acknowledge that the foreign court presiding over the original proceeding is in the better position to decide when and where claims should be resolved in a manner calculated to conserve resources and maximize assets. *In re YMB Magnex Int'l, Inc.,* 249 B.R. 402, 407 (Bankr.E.D.Pa.2000); *In re Bird,* 229 B.R. 90, 94 (Bankr.S.D.N.Y.1999); *In re Bird,* 222 B.R. 229, 233 (Bankr.S.D.N.Y. 1998); *see Victrix S.S Co. v. Salen Dry Cargo A.B.,* 825 F.2d at 713–14 *Cunard*

*S.S. Co. v. Salen Reefer Services A.B.,* 773 F.2d at 458. Section 304 allows the foreign representative to prevent creditors from grabbing local assets, *In re Bird,* 222 B.R. at 233, and expedite the orderly and equitable distribution of the foreign estate. *In re Victrix S.S. Co.,* 825 F.2d at 713–14; *see In re Petition of Tam,* 170 B.R. 838, 846 (Bankr.S.D.N.Y.1994).

■■■ A section 304 proceeding is not, however, a full blown bankruptcy. For present purposes, the most important distinction is that the filing does not trigger an automatic stay. As a result, the foreign representative generally seeks an immediate injunction in the nature of a stay on the day he files the ancillary petition. The procedure is similar to that which prevailed under the former bankruptcy act until the bankruptcy rules created the automatic stay. *See* 11 U.S.C. § 725 (1976)(repealed). Granting an immediate stay, however, is not automatic—if it were, Congress would have simply provided for an automatic stay in ancillary cases. The question, then, is what standards govern the issuance of the immediate stay. Before reaching this issue, however, I must first address a threshold objection raised by Stewart.

### A. The Cayman Islands Proceeding Is a Foreign Proceeding.

■■■ Stewart argues that the case pending before the Grand Court in the Cayman Islands is not a "foreign proceeding." A valid "foreign proceeding" is necessary to support an ancillary case, and hence, if Stewart is right, the § 304 petition would have to be dismissed.[4] According to § 101(23),

> "foreign proceeding" means proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of

4. Section 304 is available only to a "foreign representative," defined as the "duly selected trustee, administrator, or other representative

of an estate in a foreign proceeding." 11 U.S.C. § 101(24).

business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

The phrase "foreign proceeding" is broadly construed, and has three requirements: (1) the proceeding must entail an administrative or judicial process involving insolvency or reorganization, (2) it must be conducted for the purpose of liquidating an estate, adjusting its debts or effecting its reorganization, and (3) it must be pending in a foreign country where the debtor maintains its residence, domicile, principal place of business. 2 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 304.02[1], at 304–8 to 304–9 (15th rev. ed.2000) ("COLLIER"); *In re Hopewell International Insurance, Ltd.*, 238 B.R. 25, 49 (Bankr.S.D.N.Y.1999). Focusing on the second prong, Stewart maintains that the proceeding does not seek debt adjustment, reorganization or liquidation. Instead, it seeks an indefinite stay in the hope that the marchFIRST stock price will rise, and if it does, the petition will be dismissed. (*Memorandum of Matthew Stewart in Opposition to (I) Preliminary Injunction And (II) Order Pursuant to Section 304(b) of the Bankruptcy Code*, dated Nov. 13, 2000, at 4–5.)

Stewart's argument reads the definition too strictly and the motion papers inaccurately. MMG has serious financial problems. It is undeniably insolvent, and presently, cannot pay all of its creditors everything that it owes. Thus, it needs time to pay a portion or all of its debt in an equitable and orderly way, without its creditors resorting to self help. This is the essence of an insolvency proceeding. MMG intends to accomplish its goal through a judicial process overseen by the Grand Court in which creditors may participate. The fact that an out of court workout may ultimately serve the best interests of creditors is true in every insol-

vency case, *cf. see* H.R.Rep. No. 95–595, at 325, U.S.Code Cong. & Admin.News 1977, pp. 5963, 6281 (1977)(dismissal or abstention under § 305(a) may be more appropriate because a "less expensive out-of-court workout may better serve the interests in the case"); S.Rep. No. 95–989, at 36, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5822 (1978)(same), and does not alter the conclusion that the Cayman Islands case is a "foreign proceeding."

Stewart's real gripe is with MMG's good faith and the Grand Court's issuance of an allegedly improper provisional liquidation order. (*See Declaration of Howard Steven Roberts*, sworn to Nov. 22, 2000, at ¶ 5)(opining that provisional liquidators are appointed only in limited circumstances and as a temporary measure following a winding up petition where the assets are in serious and immediate danger or management is deadlocked.) The Liquidators, on the other hand, contend that MMG's use of the provisional liquidation reflects acceptable insolvency practice in the Cayman Islands. *Second Declaration of Guy Locke in Support of Motion of the Joint Provisional Liquidators of MMG LLC for Preliminary Injunction*, dated Dec. 1, 2000 ("*Second Locke Declaration*"), at ¶ 4; *In re Fruit of the Loom Ltd.*, Cause 823/99, slip op. (Cayman Isl. Grand Ct.).[5] The parties should make these arguments to the Grand Court, which is in the best position to deal with them.

### B. The Liquidators' Right to Injunctive Relief.

#### 1. The Standards for Granting Injunctive Relief

Having resolved the threshold issue in the Liquidators' favor, I turn to their request for relief. Ordinarily, a party seeking preliminary injunctive relief must show irreparable harm and either (a) a likelihood of success on the merits, or (b) a sufficiently serious question going to the merits to make it a fair ground for litiga-

---

5. The *Fruit of the Loom* slip opinion is annexed to the *Second Locke Declaration*.

tion, and the balance of hardships tipping decidedly in the movant's favor. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989); *Green v. Drexler (In re Feit & Drexler)*, 760 F.2d 406, 415 (2d Cir.1985).[6] These requirements have not been uniformly applied in § 304 cases. Some courts just look to the § 304(c) factors, as they would in granting injunctive relief under § 304(b); this approach ignores the requirement of irreparable harm because irreparable harm is not required under § 304(c). *E.g., In re Singer*, 205 B.R. 355, 356 (S.D.N.Y.1997); *In re Bird*, 229 B.R. at 92; *In re Rukavina*, 227 B.R. 234, 242 (Bankr.S.D.N.Y. 1998); *see Vesta Fire Ins. Corp. v. New Cap Reinsur. Corp.*, 244 B.R. 209, 221 (S.D.N.Y.2000); *In re Ocana*, 151 B.R. 670, 673–74 (S.D.N.Y.1993); *see also* 2 COLLIER ¶ 304.05, at 304–20 ("section 304 does not specify irreparable harm as a predicate to the issuance of an injunction"). Other courts insist that the applicant meet the usual preliminary injunction test, and hence, show irreparable harm. *E.g., Wilson v. Creditors' Comm. of Commodore Int'l Ltd. (In re Commodore Business Machines)*, 246 B.R. 476, 486 (S.D.N.Y.2000); *In re Lines*, 81 B.R. 267, 270 (Bankr.S.D.N.Y.1988); *see Univ. Casualty & Surety Co. Ltd. v. Gee (In re Gee)*, 53 B.R. 891, 894 (Bankr.S.D.N.Y. 1985) (referring to an earlier ruling that the movant "failed to carry the burden necessary for the issuance of preliminary injunctions"); 2 COLLIER ¶ 304.05, at 304–20 ("Temporary and preliminary injunctive relief is appropriate [under § 304] when the general standards for such relief are satisfied.").

The appropriate standard depends on the status of the proceeding. An ancillary case is commenced by a foreign representative filing a petition under § 304(a). The summons and petition must be served on all parties in interest, including creditors. *See* Fed.R.Bankr.P. 1010. The parties in interest have twenty days to raise objections and defenses. Fed.R.Bankr.P. 1011(b). If the petition is not converted, or after trial if it is, the bankruptcy court may award a variety of relief, including an injunction [7] against the commencement or continuation of any action against the debtor with respect to property involved in the foreign proceeding. *Id.* § 304(b).[8]

Conversely, a bankruptcy court cannot award relief against a party in interest under § 304(b) if the party's time to move or answer has not expired, or the party has filed an objection. Consequently, in most § 304 cases, the request for a prelim-

---

**6.** Irreparable harm is not required to enjoin an action whose continuation threatens the reorganization process or impairs the bankruptcy court's jurisdiction. *LTV Corp. v. Back (In re Chateaugay Corp.)*, 201 B.R. 48, 71–72 (Bankr.S.D.N.Y.1996) (quoting *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 200 (Bankr.S.D.N.Y.1992)), *aff'd*, 213 B.R. 633 (S.D.N.Y.1997). The exception does not apply in this case. MMG is not undergoing reorganization in this court. Further, while it is argued that litigation by Stewart will impair the jurisdiction of the Grand Court, it will not affect the adjudication of the ancillary case.

**7.** Section 304(b) does not distinguish between "preliminary" and "final" injunctive relief.

**8.** In deciding whether to grant (or deny relief), a court is guided by § 304(c), which states:

In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

inary injunction comes before § 304(b) is triggered. This case is a good example. The Liquidators moved for a temporary restraining order and a preliminary injunction on the same day they filed the case. They had not yet served the summons and petition, and the time to answer had not run. Further, while the Court could enter a § 304 injunction against any party in interest who did not file a timely response or objection, Stewart has filed a timely answer. Accordingly, the application of § 304(b) to Stewart is premature.

This does not mean, however, that the bankruptcy court cannot grant preliminary injunctive relief. The foreign representative is not limited by § 304(b). *Cf. Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d at 455 (§ 304 is not the exclusive remedy for a foreign bankrupt). A bankruptcy court may, in the exercise of its inherent authority under § 105(a), issue a preliminary injunction to maintain the *status quo* pending its determination of the ancillary case.[9] *See* Ulrich Huber, *Creditor Equality in Transnational Bankruptcies: The United States Position*, 19 Vand. J. Transnat'l L. 741, 763 (1986); *cf. Westinghouse Elec. Corp. v. Rio Algom Ltd. (In re Uranium Antitrust Litigation)*, 617 F.2d 1248, 1259 (7th Cir.1980) (a federal court has inherent authority under the All Writs Act to enter injunctive relief when necessary to preserve its jurisdiction over the claim before it). Where the court relies on its inherent power rather than § 304(b), the traditional standard for preliminary injunctive relief applies. In that case, the § 304(c) factors must be considered under the second prong, but do not alone determine whether relief should be granted.

## 2. The Likelihood of Success on the Merits

Taking the second prong first, the Liquidators have demonstrated that they are likely to succeed on the merits of the petition against Stewart, except to the extent they seek to prevent Stewart from liquidating his claim through an arbitration in New York. *See In re Laitasalo*, 193 B.R. 187, 195 (Bankr.S.D.N.Y.1996) (granting injunctive relief to a Finnish foreign representative under § 304(b) and (c), but permitting a creditor to liquidate her claim in a New York court). In other words, they are likely to prevail when the § 304(c) factors are applied. Our courts have granted comity to foreign insolvency proceedings pending in common law jurisdictions generally, *In re Ionica PLC*, 241 B.R. 829, 835 (Bankr.S.D.N.Y.1999); *In re Tam*, 170 B.R. at 845 (collecting cases), and in the Cayman Islands specifically. *In re Gee*, 53 B.R. at 901–04 (analyzing the Cayman Islands Companies law under the § 304(c) factors); *see In re Tam*, 170 B.R. at 846 (winding up by the court under Cayman Islands law satisfies the criteria in § 304(c)). Stewart does not challenge this proposition or its application in the ordinary case. Instead, he contends that several aspects of MMG's case fail to meet overriding concern of "economical and expeditious administration" or the specific criteria of § 304(c)(1)(just treatment of all claim holders).

Stewart's opposition boils down to three points: (1) the Cayman Islands petition is a delaying tactic, driven by the hope that the value of the marchFIRST stock will rise, (2) the proceedings have been wholly *ex parte* and unfair to creditors, and (3) the Liquidators are not truly independent. These arguments overlap. Stewart emphasizes that the *ex parte* Grand Court Order stays litigation without providing a claims resolution procedure, depriving claimants of a forum and delaying the enforcement of their rights. It also grants the Liquidators broad powers to dispose of assets and incur debt without further order of the court or notice to creditors. In short, MMG gets all of the benefits of a bankruptcy (a stay) without suffering the usual negative consequences (administer-

---

**9.** Stewart has not questioned the court's authority to award preliminary injunctive relief.

ing and paying claims, dealing with creditors, restricting the ability to transact business).

Initially, the substantive provisions of the Grand Court Order are consistent with the Companies Law. As noted above, § 99 authorizes the issuance of a stay. The moratorium on enforcement is designed to permit MMG to restructure its financial affairs. Similarly, although the Companies Law requires the Grand Court to sanction actions involving the sale of assets and incur debt, (Companies Law § 109(c), (f)), the court may grant its approval prospectively, *i.e.,* permit the liquidator to exercise his § 109 powers without further order of the court. (*Id.* § 110.) The Grand Court Order provides prior authorization consistent with the statute.

While the Grand Court Order was issued *ex parte,* creditors may participate in the proceedings and will have ample opportunity to be heard. The MMG winding up petition is returnable on January 23, 2001. (*Second Locke Declaration* ¶ 6.) At least seven days prior to the hearing, notice will be published, informing parties in interest of the case. (*See id.* ¶ 10.) Any creditor, including Stewart, can appear at the hearing and argue for the immediate winding up of MMG, the dismissal of the petition or the discharge of the Liquidators. (*Id.* ¶¶ 6–7.) If the Court rules against a creditor, he may appeal, ultimately to the Privy Council in London. (*Id.* ¶ 8.) Even if the Court continues the hearing and adjourns it (generally for six to eight weeks), it will monitor its progress through reports from the Liquidators. (*Id.* ¶¶ 6, 9; Grand Cayman Order ¶ 1(f).)

Moreover, the Companies Law provides the creditors with an additional mechanism to monitor the case. Under § 105 of the Companies Law, the court "may have regard to the wishes of the creditors and contributories," and may direct meetings of creditors and contributories. In addition, the Grand Court Order, ¶ 1(k), directs the Liquidators to "liaise with any credi-

tors and/or shareholders," and "convene any meetings of the creditors and/or shareholders and/or the Company as they may deem fit and appropriate."

In fact, the Cayman Islands case has unfolded much like a chapter 11 case. Bankruptcy petitions are filed *ex parte,* and the automatic stay issues *ex parte* by operation of 11 U.S.C. § 362(a). Although the Code and Rules establish a procedure for filing and objecting to claims, they have little import at the beginning of the case. The bankruptcy court must fix the deadline for filing claims, Fed.R.Bankr.P. 3003(c)(3), which it does not do on the first day of the case. The principal effect of filing a claim early is submission by the creditor to the jurisdiction of the bankruptcy court. In practice, moreover, the claims review and objection process occurs later in the case, frequently after confirmation. Hence, the failure to couple a claims review process with the grant of an immediate stay on the first day of the case is neither unusual nor unfair.

The Grand Court monitors its case in the same way this court would monitor a chapter 11 case. Our local rules mandate the issuance of a case management order, Bankr.S.D.N.Y. R. 1007–2(2), and bankruptcy courts regularly oversee their chapter 11 cases through periodic status conferences. *See* 11 U.S.C. § 105(d). Creditors are parties in interest, and may raise, appear and be heard on any issue in the case. 11 U.S.C. § 1109(b). If a creditor in a chapter 11 case is aggrieved by the resolution of the issue, he may appeal that determination to an appellate court.

Further, the powers granted to the Liquidators are also similar to those conferred on a debtor-in-possession. A chapter 11 debtor can sell assets, 11 U.S.C. § 363, and incur debt. 11 U.S.C. § 364. This authority extends to both ordinary and extraordinary transactions. The only difference is that a debtor must seek court approval, on notice to creditors, prior to engaging in extraordinary transactions un-

der §§ 363 and 364. Here, the Grand Court Order has dispensed with the pre-approval requirement in accordance with Cayman Islands law.

This distinction does not render the Cayman Islands so unfair that comity would be unwarranted. First, as noted, the creditors can participate in the proceedings and monitor the case by attending hearings, "liaising" with the Liquidators and reviewing their reports. Second, the Liquidators must answer to the court which appointed them and can remove them for cause. (Companies Law § 107.) Under these circumstances, not requiring prior notice and approval of extraordinary transactions does not render the provisional liquidation unfair or prejudicial to creditors.

Stewart's related challenge to the independence of the Liquidators also lacks merit. He contends that the board of directors controls them, but he is wrong. Although the board of directors continues to manage MMG's day-to-day business, (Grand Court Order ¶ 1(a)), the Liquidators exercise their powers independently. The Liquidators are fiduciaries. *See In re Tam*, 170 B.R. at 842 ("liquidators ... are fiduciaries who must act in the best interest of the creditor body as a whole"). They must act in the best interests of the estate, exercise independent judgment, and if appropriate, veto management's decisions. (*See* Second Locke Declaration ¶ 14.) If management ignores the Liquidators, they must report management's activities to the court. *In re Fruit of the Loom Ltd.*, slip op., at 5. The Liquidators "oversee" the board and attend its meetings, (*id.* ¶ 1(b)), have sole authority to file, appear and be heard on behalf of MMG in any ancillary or chapter 11 case, (*see id.* ¶ 1(c), (d)), sell assets and incur debt, (*id.* ¶ 1(e)), retain professionals and pay the professionals as well as themselves using MMG assets, (*id.* ¶ 1(g), (h)), and draft and implement schemes and cross-border protocols. (*Id.* ¶ 1(i), (j).) Finally, they are obliged to advise the court if the objectives of the case have failed. *In re Fruit of the Loom Ltd.*, slip op., at 5–6.

Stewart's attempt to liken this case to *In re Hourani*, 180 B.R. 58 (Bankr. S.D.N.Y.1995), misses the mark. *Hourani* involved a Jordanian Bank liquidation. A special liquidation committee appointed by the Central Bank of Jordan commenced a § 304 case aimed at preventing the continuation of a litigation by a United States note holder who had attached the debtor's funds in New York. Judge Lifland of this Court declined to grant relief in light of the § 304(c) factors, noting numerous deficiencies in the Jordanian proceeding. For example, the liquidation committee could dispose of assets and deal with claims in the manner it deemed appropriate. Creditors had no right to information about or to object to the committee's actions, or to appeal its actions. *Id.* at 66–67. The provisions for notice to creditors were inadequate. *Id.* at 68. The controlling law did not include provisions for the recovery of fraudulent transfers and preferences. *Id.* The Jordanian law did not distinguish between secured and unsecured creditors. *Id.* at 69. Finally, the process was unpredictable and uncertain, and the law lacked the minimum assurances of safeguards for the fair treatment of creditors. *Id.* at 70.

In contrast, foreign insolvency proceedings pending in common law jurisdictions are afforded comity under § 304(c) precisely because they are predictable and fair. It is true that the Liquidators do not have to seek court approval on notice to creditors in certain circumstances. Nevertheless, there is a stark disparity between the powers granted to the Liquidators under Cayman Islands law, to be exercised by independent fiduciaries and subject to review under predictable and well known common law principles, and the unfettered, unpredictable and unreviewable discretion that the liquidation committee could secretly exercise in *Hourani*.

Stewart also challenges the Liquidators' independence based upon their selection of

Cadwalader, Wickersham & Taft as their counsel both in the Cayman Islands and the United States. According to Stewart, Cadwalader has represented MMG for years, and the Liquidators will not be able to take action adverse to MMG's management or directors. Stewart does not state whether Cadwalader still represents MMG, but the answer is obvious. If Stewart thinks Cadwalader cannot exercise independent judgment, he should move to disqualify the lawyer, not the client.

In summary, the Liquidators are likely to succeed on the merits of the § 304 petition. At this stage, however, this is not enough. In order to obtain preliminary injunctive relief, they must also demonstrate irreparable harm.

### 3. Irreparable Harm

The guiding principle of bankruptcy law is equality of distribution. *Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d at 459. As a rule, therefore, irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors. *See In re Lines,* 81 B.R. at 270; 2 COLLIER ¶ 304.05, at 304–20 to 304–21. The commencement or continuation of litigation raises a more difficult issue. Irreparable harm may result if the foreign representative is forced to participate in expensive litigation that threatens to drain the assets of the estate, *see In re Gercke,* 122 B.R. 621, 626 (Bankr.D.D.C.1991), or open the floodgates to similar litigation. *See In re YMB Magnex Int'l, Inc.,* 249 B.R. at 408.

The Liquidators have failed to demonstrate that permitting Stewart to liquidate his remaining claims before an arbitrator will cause irreparable harm. It will not open any floodgates as there are only two

disputed shareholder claims. (*Transcript of hearing,* held Nov. 13, 2000 ("*Tr.*"), 26.) Nor have they shown that the cost of the arbitration will threaten the estate. In addition, the Liquidators have conceded that Stewart's claim must be liquidated under any scenario short of a settlement, (*Tr.* 27–28), and the arbitration fulfills the parties' bargain. Under the Amended & Restated Shareholders' Agreement, which itself is governed by New York law, (*see* § 5.6) (*Philipson Affidavit,* Ex. p. 110), disputes must be arbitrated in New York City before Judith Vladek, Esq., a New York attorney. (*Id.,* Ex. p. 108) (Amended & Restated Shareholders Agreement § 3.1).[10]

In conclusion, the Liquidators' motion for a preliminary injunction is granted except to the extent that Stewart may commence or continue the arbitration proceedings in accordance with the parties' shareholders agreement. Stewart cannot, however, enforce or collect his claims absent further order of this Court. Settle order on notice.

---

10. It does not appear that Stewart signed the amended shareholders agreement, but it does not matter. The parties' first arbitration was conducted in New York before Ms. Vladek, who subsequently recused herself from future arbitrations, and whatever document governed the resolution of their dispute apparent-

ly includes the same procedures. Further, the Liquidators have submitted the amended shareholders agreement for my consideration, and I can treat the cited provisions as an admission that dispute resolution is based in New York.