In re NETIA HOLDINGS S.A., et al., Debtors in a Foreign Proceeding.

No. 02–10744(REG).

United States Bankruptcy Court, S.D. New York.

April 29, 2002.

Weil Gotshal & Manges LLP, New York City, by Marcia Goldstein, Scott Cohen, Sascha N. Rand, for Petitioners.

Friedman Kaplan Seiler & Adelman LLP, New York City, by Anne E. Beaumont, Heather Windt, for SISU Capital Limited.

Cadwalader Wickersham & Taft, New York City, by Gregory Petrick, Richard Nevins, for Ad Hoc Committee of Noteholders.

Shipman & Goodwin LLP, Hartford, CT, by Ira H. Goldman, Kathleen M. La-Manna, for the Indenture Trustee.

Sonnenschein, Nath & Rosenthal, New York City, by Carol Neville, for Triage Capital Management, L.P.

## DECISION AND ORDER ON MOTION TO DISMISS CASE

ROBERT E. GERBER, Bankruptcy Judge.

This case under section 304 of the Bankruptcy Code—a case ancillary to a foreign proceeding—was commenced by Kjell–Ove Blom, Avraham Hochman, Ewa Don–Siemion, Mariusz Piwowarczyk, Mariusz Chmielewski and Dariusz Wojcieszek (the "Petitioners"), as members of the management board of Netia Holdings, S.A. ("Netia Holdings"), Netia Telekom S.A. ("Netia Telekom") and Netia South Sp.z.o.o. ("Netia South", and together with the others, "Netia," or the "Foreign Debtors"), corporations organized under the law of Poland.

Bondholders SISU Capital Limited ("SISU"), Triage Capital Management Limited Partnership, Triage Offshore Limited Partnership and OTA Limited Partnership (the latter three of which are collectively "Triage," and, together with SISU, the "Moving Bondholders") move to dismiss the case,[1] asserting that Netia failed to satisfy the requirement that the

U.S. proceeding be in aid of a "foreign proceeding" as that term is defined in Bankruptcy Code section 101(23) and used in section 304(a).[2]

For the reasons set forth below, the motion is denied. The following are the Court's findings of fact and conclusions of law in connection with its determination.

### Facts

The underlying facts (which include proof of foreign law, which has been offered by declaration), insofar as relevant to this motion, are not in dispute. However, the parties' characterizations of those underlying facts, and views as to conclusions to be drawn from them, differ. The facts in those two categories are discussed in turn.

### A.

#### 1. Background

Netia Holdings S.A. ("Netia Holdings") is a provider of fixed-line telecommunications services in Poland. Netia Telekom S.A. ("Netia Telekom") and Netia South ("Netia South") are subsidiaries of Netia Holdings.[3]

SISU is the general partner of the investment managers SISU Capital Limited Partnership and SISU Capital Limited

---

1. SISU, joined by Triage, also moved to vacate the temporary restraining order ("TRO") entered by this Court on the first day of the case. For reasons stated on the record at the conclusion of the argument, the motion to vacate the TRO was denied. As then announced on the record, the Court reexamined, ab initio, Netia's entitlement to the TRO in light of the Moving Bondholders' objection. The Court concluded that Netia had shown irreparable injury and, at the least, serious issues going to the merits and a balance of harms tipping decidedly in its favor.

2. The motion is opposed not just by Netia, but also by Alliance Capital (New York), Bank Pekao S.A. (Warsaw), Federated Investment Global Management (New York), ING Investment Management (The Hague, Netherlands), and Trust Company of the West (Los Angeles), each members of an ad hoc committee (the "Ad Hoc Committee") of other bondholders, with ownership interests wholly or substantially in different bonds.

3. Declaration of Anne E. Beaumont, dated April 12, 2002 ("Beaumont Decl.") Ex. C at 3.

Partnership II.[4] SISU is based in London, England, and through certain of its investment funds is the holder of positions in several series of debt instruments issued by subsidiaries of Netia Holdings and guarantied by Netia Holdings.[5]

One of those series of notes is the issue of 13–3/4% Senior Notes due 2010, which were issued pursuant to an indenture dated as of June 9, 2000 (the "2000 Notes").[6] As a holder of the 2000 Notes, SISU is a beneficiary of contractual arrangements, alleged by the Moving Bondholders to be an escrow (the "Alleged Escrow"), granted by Netia Holdings and held by State Street Bank and Trust Company ("State Street"), to ensure that holders of the 2000 Notes would receive the first four semiannual interest payments thereunder.[7] Netia disputes that the Alleged Escrow is in fact such,[8] though it does not dispute that Netia Holdings II B.V., the issuer of the 2000 Notes, is in default on these notes.[9]

### 2. Polish Insolvency Law

Under Polish law, once a debtor realizes it is unable pay its debts as they come due, the members of the management board must authorize the commencement of an insolvency proceeding or risk personal liability for debts incurred by the debtor.[10] Polish insolvency law provides for two avenues for protection from creditors. A debtor may (1) wind-up operations and liquidate its assets through the Bankruptcy Law, or (2) seek to restructure its debt obligations and preserve its existence as a going concern through what the parties refer to alternatively as the "Arrangement Proceedings Act" or "Composition Proceedings Law." [11]

Notwithstanding a company's satisfaction of its duty to creditors to commence a proceeding under one of Poland's insolven-

---

4. Declaration of Joy V. Seppala, sworn to April 12, 2002 ("Seppala Decl.") ¶ 2.

5. Seppala Decl. ¶ 2.

6. Seppala Decl. ¶ 3.

7. Beaumont Decl. Exhs. D at 10; E at 1, ¶¶ 9.1, 9.2, 14.1.

8. Netia calls the Court's attention to an Investment Agreement entered into in connection with the issuance of the notes. (Beaumont Decl. Exh. E). It provides, in relevant part:

> Anything in this Agreement to the contrary notwithstanding, no pledge, security interest or lien (or any other interest that would constitute a Lien under and as defined in the Indenture) shall be created or deemed to be created by this Agreement, and any provision determined by a court of competent jurisdiction to create any such interest shall be null and void, ab initio. The Investment Interest forms part of the general assets of the Payors available to their creditors in the event of an insolvency in accordance with applicable insolvency laws.

*Id.* ¶ 12. The Court need not, and does not, make any determinations with respect to this difference of views at this time.

9. Beaumont Decl. Ex. F at 2.

10. Declaration of Artur Zawadowski, dated February 20, 2002 ("Zawadowski Decl. I") at ¶¶ 7–10.

11. Zawadowski Decl. I at ¶¶ 7–11. While Netia speaks of "Arrangement" Proceedings and the Moving Bondholders speak of "Composition" Proceedings, the Court finds that there is no material difference as a consequence of the alternative ways of describing them in English. The only evidence in the record so far indicates that "Arrangement" Proceedings and "Composition" Proceedings are one and the same thing, and the difference in terminology results only from an apparent difference of opinion in the translation of the Polish term into English. (Declaration of Piotr Szelenbaum, dated April 12, 2002 ("Szelenbaum Decl.") ¶ 48). In the interests of brevity and simplicity, the Court will refer to them as "Arrangement" Proceedings.

cy statutes, a creditor may still apply for an "involuntary" bankruptcy declaration prior to a court's decision to grant an application to advance the Arrangement Proceeding to "opened" status.[12] Under such circumstance, the Polish court examines both the debtor's application for Arrangement Proceedings, and the creditor's petition for declaration of bankruptcy; it then decides whether to open Arrangement Proceedings or order liquidation.[13] However, no petition of the latter character—i.e., for a declaration of bankruptcy—has been filed with respect to any of Netia Holdings, Netia Telekom, or Netia South.[14]

### (a) Arrangement Proceedings in Poland

Pursuant to the Polish Arrangement Proceedings Law, Arrangement Proceedings are a court proceeding in which a debtor, its creditors and the court work together in order to reach a settlement.[15] A settlement is an understanding executed in the course of Arrangement Proceedings between the debtor and its creditors, to be confirmed by a qualified majority of its creditors, in which these parties agree upon the scope and the method of satisfying the creditors' claims.[16] A settlement becomes effective upon the court's final approval.[17]

Arrangement Proceedings are conducted before courts, and may only be initiated pursuant to a motion filed by the debtor.[18] They are carried out before the district business court having territorial jurisdiction over the registered office of the main establishment of the debtor's business.[19]

The Moving Bondholders properly observe that Arrangement Proceedings consist of several stages, each of which serves a separate function,[20] but they elect to describe the process beginning at the time the Court grants the debtor's application (Stage "3" below), a description which this Court finds is incomplete. The process is triggered by (1) the filing of an application by the debtor,[21] followed by (2) a period during which the application is considered prior to a granting of the application, at which time the parties in interest have rights described below.[22] Thereafter, stages of Arrangement Proceedings include:

(3) proceedings starting on the date of the court decision granting a debtor's application to initiate the Arrangement Proceedings and ending with the adoption of the settlement;

(4) approval of the settlement by the court;

(5) implementation of the settlement; and, in certain situations,

(6) repeal of the settlement.[23]

Without dispute, Arrangement Proceedings do not automatically commence upon the filing of the relevant application by the debtor, and an application to open Ar-

---

12. Declaration of Artur Zawadowski, dated April 17, 2002 ("Zawadowski Decl. II") ¶ 21.

13. *Id.*

14. Zawadowski Decl. II ¶ 22.

15. Szelenbaum Decl. ¶ 15.

16. *Id.*

17. *Id.*

18. Szelenbaum Decl. ¶ 18.

19. *Id.*

20. Szelenbaum Decl. ¶ 16.

21. Zawadowski Decl. II. ¶ 15.

22. *Id.* ¶ 16.

23. Szelenbaum Decl. ¶ 16 (with respect to Stages "3" through "6").

rangement Proceedings is not granted as a matter of course.[24]

### (b) Proceedings While an Application to Open Arrangement Proceedings Is Pending

After an application has been filed, and prior to the "opening" of the Arrangement Proceeding, a Polish court has remedies at its disposal to protect the estate of the debtor. The court may schedule hearings and require the presence of the debtor's representatives in order to take evidence in support of the application.[25] Such hearings and requests for testimony are subject to the Civil Procedure Code of Poland, which affords participants with protections such as due process, the right to counsel, rules pertaining to burden of proof, rights of appeal, evidence rules, jurisdiction and venue rules, and rules with respect to the recusal of judges.[26] During this initial stage of the Arrangement Proceedings, creditors may participate in the court's evaluation of a debtor's application.[27] Creditors may file pleadings in support of or in opposition to the debtor's application or, in the alternative, seek consideration by the Polish court of a motion to liquidate the assets of the debtor under the Bankruptcy Law.[28]

As previously noted, upon the filing of an application for Arrangement Proceedings, a Polish court must consider whether an arrangement proceeding should be "opened." The Arrangement Proceeding Act provides that the court issue its deci-

sion to open an arrangement within two weeks following receipt of the debtor's motion. This deadline may, however, be extended by the court if necessary.[29]

The deadline may be considerably extended, as, for example, it might be in a situation where the court determines to appoint experts to assist it in making its determination.[30] In such event, the court will wait for the experts' opinions in order to sufficiently clarify any issues raised by the debtor before initiating the Arrangement Proceedings.[31] Only after having received and reviewed the experts' opinions will the court schedule the trial at which the decision to initiate the proceedings may be taken.[32]

Polish law does not permit an appeal of a decision granting an application to open Arrangement Proceedings. However, a debtor may appeal a decision rejecting such an application.[33]

### (c) Protections Afforded Creditors and the Debtors' Estate Upon the Filing of an Application

Upon the "opening" of Arrangement Proceedings, there is an automatic stay against the enforcement of debts incurred prior to the opening of such proceedings. While no automatic stay is in place prior to that time (i.e., as a consequence of the filing of an application), during the court's review of an application for Arrangement Proceedings, it may stay an execution lev-

---

24. *Id.* ¶ 22; Zawadowski Decl. ¶ 16. An application is, however, a prerequisite for their initiation. (Szelenbaum Decl. ¶ 17).

25. Zawadowski Decl. II ¶¶ 14, 17.

26. Zawadowski Decl. II at ¶ 17.

27. Zawadowski Decl. II at ¶ 8.

28. Zawadowski Decl. II at ¶ 18.

29. Zawadowski Decl. I ¶ 12; Szelenbaum Decl. ¶ 26.

30. Szelenbaum Decl. ¶ 26.

31. Szelenbaum Decl. ¶ 26.

32. Szelenbaum Decl. ¶ 26.

33. Szelenbaum Decl. ¶ 27.

ied against the debtor by a creditor seeking repayment of a debt subject to such Arrangement Proceedings where enforcement of such obligation might prevent or otherwise hinder the debtor's ability to restructure its debts. Prior to the filing of an application to open Arrangement Proceedings, such injunctive relief is not available.[34] As Netia's creditors have respected efforts to commence the Arrangement Proceedings underway, Netia has had no need to file for any injunctive relief to prevent any creditor from enforcing an obligation.[35]

Until a debtor's application to open Arrangement Proceedings is acted upon by the court, creditors are generally allowed to pursue their claims against the debtor in court, by arbitration proceedings or by negotiating with the debtor directly.[36] However, as of the filing of a debtor's application to open Arrangement Proceedings, the court may, as noted, suspend any enforcement pending against the debtor if the debtor shows that such enforcement might prevent the satisfaction of claims of other creditors or hinder an eventual settlement.[37]

As a general rule, while the debtor's application to open Arrangement Proceedings is pending, there is no court supervision or administration of or involvement in the debtor's business.[38] Likewise, as a general rule, the debtor entity is not restricted from running its business, selling its assets or paying its creditors while its application to open Arrangement Proceedings is pending.[39]

Upon filing the Arrangement Proceeding application, the creditors are given the full right to lodge objections and be heard by the Court. Creditors may file pleadings to support the debtor's application or oppose the opening of arrangement proceedings. A creditor may present evidence to the court in support of its pleadings.[40]

*(d) The Effect of an Order Granting an Application to Open Arrangement Proceedings*

If the Polish court issues a decision to open Arrangement Proceedings, it will then, among other things: (a) appoint a "court supervisor" who supervises the debtor's business (for example, by giving consent to the debtor to perform any actions exceeding the day-to-day management of the business) and carries out his functions either until a binding settlement is approved by the court or until the proceedings are otherwise discontinued; and (b) appoint a "judge-commissioner" who (i) directs the course of the proceedings, (ii) exercises supervision over the actions taken by the court supervisor, and (iii) carries out, in the course of the proceedings, any actions that do not fall within the area of responsibility of the court.[41]

Once an Arrangement Proceeding is opened, there follow other consequences that remain in place until a final decision is made regarding the settlement. They include:

  (a) restrictions on the debtor with respect to the freedom to dispose of its assets,[42] and certain restrictions imposed

---

**34.** Zawadowski Decl. II ¶ 23.

**35.** Zawadowski Decl. II ¶ 24.

**36.** Szelenbaum Decl. ¶ 19.

**37.** Szelenbaum Decl. ¶ 19.

**38.** Szelenbaum Decl. ¶¶ 17, 20.

**39.** Szelenbaum Decl. ¶ 20.

**40.** Zawadowski Decl. II ¶ 18.

**41.** Szelenbaum Decl. ¶ 28.

**42.** I.e., the debtor is only allowed to take such actions as will not exceed the scope of the day-to-day management of its business.

on the debtor with respect to its involvement in certain legal proceedings;[43]

(b) prohibitions with respect to the initiation and continuation of enforcement proceedings against the debtor for the purpose of satisfying any debts covered by the Arrangement Proceedings;

(c) the suspension of any enforcement proceedings instituted prior to the issuance of the decision to institute Arrangement Proceedings; and

(d) the prohibition of the debtor's repayment of any debts covered under the Arrangement Proceedings, and, after the court approves the settlement, the prohibition of repayment of such debts contrary to the provisions of the approved settlement.[44]

### 3. Arrangement Steps Taken to Date

On February 20, 2002, each of the Foreign Debtors filed applications for the opening of Arrangement Proceedings (the "Applications") in the District Court for the Capital City of Warsaw, XVII Bankruptcy Arrangement Commercial Division, in Warsaw, Poland.[45] The Polish Court, in the course of its supervision of the proceeding, issued a certificate indicating that a proceeding has been commenced, stating "[t]he proceedings for opening of the arrangement are underway."[46]

On the same day, February 20, 2002, the Petitioners filed their petition in this Court to commence this section 304 case, and sought a TRO prohibiting various forms of conduct with respect to the Alleged Escrow as well as numerous other forms of conduct with respect to Netia and State Street, the indenture trustee under Netia's bond issues. This Court entered the requested TRO on February 20, 2002, and on March 15, 2002, the TRO was extended to April 30, 2002 by consent of the parties then appearing in the proceeding, having already been previously extended on consent.[47]

Shortly after the filing of the Applications, the court considering the Foreign Debtors' applications commenced hearings to consider the Foreign Debtors' requests for opening of Arrangement Proceedings.[48] At hearings held on March 5, 2002 and March 14, 2002, the Polish court heard testimony from three members of the management board.[49]

On March 14, 2002, the Foreign Debtors presented the Polish court with a Restructuring Agreement, dated March 5, 2002

---

43. E.g., if the debtor acknowledges claims of a counter-party, waives its claim, or concludes a settlement without the consent of the court supervisor, such action will have no legal effect with respect to creditors.

44. Szelenbaum Decl. ¶ 29.

45. Zawadowski Decl. II ¶ 9.

46. Zawadowski Decl. II ¶ 15.

47. Without dispute, Netia secured the TRO without advance notice to anyone, after having made a showing, by affidavit and again on the record, upon an express request by the Court at the TRO application hearing, as to why advance notice could not be provided. The Moving Bondholders have shown by declaration that they did not receive notice of the TRO after its issuance until several weeks had passed. The Court accepts this as true, but also finds that Netia took reasonable steps to provide notice. Ultimately, however, none of this is relevant to the issue before the Court on this motion.

48. Zawadowski Decl. II at ¶ 12.

49. Id. In their expert's affidavit, the Moving Bondholders say that on March 5, the Polish court "was provided with statements" by two of those board members, and that on March 14, another of them "presented a statement." (Szelenbaum Decl. ¶¶ 9, 10). The Court accepts the more specific articulation offered by the Petitioners, which was not countered by the Moving Bondholders.

(the "Restructuring Agreement"), among the Foreign Debtors, the two Dutch subsidiaries of Netia Holdings that were the issuers of notes, certain note holders, and other entities.[50] As of the date of the second Zawadowski Declaration, a sufficient number of Netia's creditors—representing over 80% of the total value of Netia's obligations—had approved the terms of the Restructuring Agreement, and a threshold required for the approval of the arrangement plan in accordance with the Arrangement Proceedings Act had been achieved. As of that same date, approximately 92% of the holders of the public debt guaranteed by Netia had approved the Restructuring Agreement.[51] Also at the March 14, 2002 hearing, the Polish court ordered the appointment of an examiner to review issues related to Netia's qualifications to open an arrangement.[52] As of the time the parties' moving papers were filed, the examiner report was expected around April 29, 2002.[53]

As of the time of the hearing on the motion, the applications of two of the three Foreign Debtors had not yet been granted; the Polish court granted the application for the third of them, Netia Telekom, on the day of hearing on the motion, shortly before the motion was argued.[54] The record does not reflect whether any upcoming hearings are scheduled with respect to any of the Foreign Debtors' applications, whether with respect to the two Foreign Debtors as to whom proceedings are not yet opened, or the one for which they are. As of the time of the hearing on the motion in this Court, no entity had sought any order from the Polish court granting interim relief while Netia's applications to open Arrangement Proceedings were pending, nor had any such order been entered.[55]

### B.

The Court makes additional findings as conclusions from the underlying facts as set forth above.

During the period between the time of the filing of an application and the determination as to whether the application for the Arrangement Proceeding will be granted, the judges of the Polish court exercise the focused attention on the law and facts, and make decisions, as judges customarily

50. Zawadowski Decl. II at ¶ 12.

51. Zawadowski Decl. ¶ 13. The Moving Bondholders are among the 8% of public debt holders who oppose the terms of the Restructuring Agreement. *Id.* Needless to say, their status as dissenters is wholly irrelevant to the legal issues on this motion.

52. Zawadowski Decl. II ¶ 14. As the Moving Bondholders' Polish law expert stated in his affidavit, the court then adjourned the hearing *sine die* in order to obtain an expert opinion to evaluate Netia Holdings' proffered reasons for its loss of liquidity. Szelenbaum Decl. ¶ 10.

53. *Id.*

54. Counsel for Netia so advised the Court at oral argument on that day, April 22, 2002; though her representation to that effect was not backed up by affidavit, her representation was not disputed by the Moving Bondholders, and SISU has since agreed. (*See* SISU Memorandum in Opposition to Motion for Preliminary and Permanent Injunctions, dated April 24, 2002 at 17). The Moving Bondholders have not contended that after its "opening," a Polish Arrangement Proceeding fails to meet the requirements of sections 304(a) and 101(23) for status as a foreign proceeding, and the motion no longer is even debatable with respect to Netia Telekom. Neither side contended that the "opening" with respect to Netia Telekom was determinative of the motion with respect to Netia Holdings and Netia South, however, and the Court addresses the issues with respect to them accordingly.

55. Szelenbaum Decl. ¶ 13.

do, with respect to whether the Arrangement Proceeding as requested meets the requirements of Polish law. They hold hearings. They examine witnesses. They are available to hear requests for additional relief from the debtor side, on the one hand, and any objections from the creditor side, on the other. These are classic indicia of a judicial proceeding. The Court finds that while an application for an Arrangement Proceeding is pending, there is material and substantial court involvement, and opportunity for creditors to be heard.

This Court also finds that the Moving Bondholders' description of the Arrangement Process, while accurate as far as it goes, is incomplete, and does not appropriately describe the entirety of the process. This Court finds that the Arrangement Proceeding in Poland is a *continuing* process, beginning with the filing of the application, which the Polish court may grant or deny, with a right to appeal that determination in the event of a denial, and with the rights on the part of parties in interest described above along the way. While additional rights on the part of the parties, and limitations on the operation of the Polish debtor's business, come into being after the application is granted and the Arrangement Proceeding is "opened," the Arrangement Proceeding is no less a judicial proceeding in its earlier stages.

The Court thus finds, as facts or mixed questions of fact and law, that during the time after the filing of the application and before the entry of an order granting it, the proceeding commenced by the filing of the application is a "judicial" "proceeding" within "a foreign country" for the purpose of "adjusting debts by composition" or "effecting a reorganization," both because it is part and parcel of a continuous process that plainly satisfies each of those requirements, and because, even if viewed in isolation, it does so.

### Discussion

Bankruptcy Code section 304(a) provides:

> (a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.

11 U.S.C. § 304(a).

"Foreign proceeding," as used in section 304(a), is defined in section 101(23). It provides:

> (23) "foreign proceeding" means proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization . . . .

11 U.S.C. § 101(23). The language of section 101(23) is broad, and by its terms encompasses a broad array of types of proceedings; requirements are notably absent in section 101(23) with respect to a proceeding's procedural status, so long as it otherwise meets the statutory requirements.[56] The caselaw in this district is consistent with that; while a valid "foreign proceeding" is necessary to support an

---

**56.** They likewise are notably absent with respect to what the foreign tribunal might do at that point in time, such as impose an automatic stay or require court control over the debtor's business operations.

ancillary case, *see In re MMG LLC*, 256 B.R. 544, 549 (Bankr.S.D.N.Y.2000) (Bernstein, C.J.) (*"MMG"*), the phrase "foreign proceeding" is to be broadly construed. *Id.*[57]

■ In determining whether a foreign proceeding meets the requirements of section 101(23), three requirements must be met:

(1) the proceeding must entail an administrative or judicial process involving insolvency or reorganization;

(2) it must be conducted for the purpose of liquidating an estate, adjusting its debts or effecting its reorganization; and

(3) it must be pending in a foreign country where the debtor maintains its residence, domicile, [or] principal place of business.

*MMG*, 256 B.R. at 549.

■ This Court has little doubt that those requirements are met here. The Arrangement Proceeding plainly entailed a judicial process involving reorganization.[58] Its exact purpose was to adjust Netia's debts and effect its restructuring. The Arrangement Proceeding, being pending in Warsaw, Poland, is pending in the foreign country where the debtor is domiciled and has its principal place of business, and is not an ancillary proceeding itself.[59]

It also has been held in this district that in determining whether the requisite foreign proceeding exists, the Court should consider "the amount of judicial involvement and supervision." *In re Board of Directors of Hopewell International Insurance, Ltd.*, 238 B.R. 25, 50 (Bankr. S.D.N.Y.1999) (Brozman, C.J.) (*"Hopewell I"*), *aff'd* 275 B.R. 699 (S.D.N.Y.2002) (Chin, J.) (*Hopewell II*).[60] After doing so,

---

**57.** Other authority is to the same effect. *See* 2 *Collier on Bankruptcy* ¶ 101.23 at page 101–86 (15th ed. rev.2000) (*"Collier"*) ("The definition of 'foreign proceeding' is very broad and encompasses a wide range of potential foreign insolvency and debt adjustment procedures").

**58.** *Collier* has noted, in connection with the first requirement:

First, the process must involve a "proceeding." That term entails a process conducted under the auspices of an administrative or judicial agency charged with the they duty of regulating the entity being liquidated. Thus a Cayman Islands liquidation which was not subject to any judicial or administrative supervision has been held not to qualify as a proceeding within the meaning of section 101(23). Similarly, an English receivership imposed by the crystallization of a floating charge on property of the debtor would not constitute a proceeding.

*Collier* ¶ 101.23 at page 101–86 (footnotes omitted). The Cayman Islands proceeding referred to in the first of the examples *Collier* mentioned was addressed by Judge Garrity of this Court in his decision in *In re Tam*, 170 B.R. 838–842 (Bankr.S.D.N.Y.1994), discussed below. For understandable reasons, the Moving Bondholders have not contended

that Netia's case can be analogized to the English floating charge situation to which *Collier* referred in the second example. Notably, the *Collier* discussion does not focus on the procedural status of the foreign proceeding.

**59.** That is the thrust of the third requirement. *See Collier* ¶ 101(23) at page 101–87 (by reason of the third requirement, "[a]n ancillary proceeding pending in a foreign jurisdiction may thus be excluded from the definition of a foreign proceeding").

**60.** Another factor considered in *Hopewell I* was the rights of creditors to be significantly involved in the proceeding. This Court has found here that in the period following the filing of the application and before the granting of relief, creditors may participate in the Polish court's evaluation of a debtor's application, and may file pleadings in support or opposition to the debtor's application or, in the alternative, seek consideration by the Polish court of a motion to liquidate the assets of the debtor under the Bankruptcy Law. This is plainly sufficient to meet any requirements in this regard, and this factor too is not a basis for disqualifying a Polish Arrangement Proceeding from treatment as a foreign proceeding under section 304(a).

this Court finds that this factor hardly disqualifies the Polish proceeding here. This Court has found that in Poland, during the phase between the filing of the application and the Polish court's determination as to whether or not the Arrangement Proceeding should be "opened," the Polish court holds hearings; examines witnesses; is available for additional relief (e.g., injunctions against the enforcement of claims); and will hear objections thereto. Creditors have the right to be heard. Its determination to deny relief can be appealed. This Court has found as a fact that during this time, the judges in Poland in matters of this character exercise the focused attention on the law and the facts, and make the decisions, that judges customarily do. After analysis of the "amount of judicial involvement and supervision" in Arrangement Proceedings in Poland in the pre-"opening" phase, this Court's conclusion that they meet the statutory test of section 101(23) is reinforced, and not weakened.

SISU contends that because the Arrangement Proceeding in Poland, while commenced, has not yet reached the procedural stage of "opened," the proceedings as commenced to date in Poland are insufficient to constitute a "foreign proceeding" to which this Court can provide assistance. The Court disagrees.

As stated in *Tam,* a "proceeding" is interpreted as "[r]egular and orderly progress in form of law, including all possible steps in an action from its commencement to the execution of judgment." 170 B.R. at 842. The expression "proceeding" include[s] ". . . all possible steps in an action from its *institution* to the execution of judgment." *Id.* at 842–843 (emphasis added). *See also Hopewell I,* 238 B.R. at 49 (the "ordinary meaning of the word 'proceeding' is a particular step or series of steps adopted for doing or accomplishing something"). Those decisions, while appropriately relying in part on legal and general purpose dictionaries, were, more significantly, consistent with the usage of litigators and common sense.[61] This Court believes it should consider what is or is not a "proceeding" by the same standards.[62]

61. In *Hopewell I,* Judge Brozman noted that she preferred to use a general usage definition as compared to one in Black's Law Dictionary, as being more reflective of common understanding. See 238 B.R. at 49 n. 20. This Court shares that view.

62. Netia argues, with considerable force, that the Arrangement Proceeding application's "opening" is analogous to the commencement of an involuntary proceeding under section 303 of the Bankruptcy Code, as in involuntary bankruptcy cases in the United States, a petition is filed, commencing the case, but the order for relief (corresponding to the "opening" under Polish law), is granted at a later time. This Court considers that analogy to be an apt one.

The Court feels that way even though it is true, as the Moving Bondholders argue, that in the United States, when an involuntary petition is filed under section 303, the automatic stay attaches at that time, see section 362(a), and that in Poland, after the filing of the application, the stay is not automatic, and relief of that nature must be specifically requested. However, under the former Act, before Bankruptcy Rule 11–44 became effective, that was the general rule in Chapter XI cases in the United States as well. And even where there was an automatic stay "of sorts" in Chapter X cases, under Act section 148, "the stay did not become effective until an order approving the petition was entered, an event which might but did not have to follow shortly upon filing of the petition," 3 *Collier* ¶ 362.-LH[2] at page 362–124—a situation remarkably close to what we have here.

Especially since the procedures in Poland in the period in question have such similarities to involuntary proceedings under the Code and proceedings under several chapters of the former Act, it would be inappropriate to deny the Polish Arrangement Proceeding status as a foreign proceeding under section 304(a).

The Court has found that the proceedings commenced by the Petitioners were the start of a *continuing* process,[63] the entirety of which was a "foreign proceeding." The Court has also found that even if the pre-"opening" phase were examined in isolation, it would still meet the requirements discussed above. The caselaw cited above compels both conclusions, and the facts (which this Court takes as true) that: (a) the Polish court has not yet taken all of the actions that it could take or may take in the future; (b) the Polish court has had no occasion to issue injunctions in aid of the proceeding; and (c) creditors of Netia have not yet appeared, so far as the record reflects, expressing a desire to be heard,[64] do not change either result.[65]

The Moving Bondholders rely principally on two decisions for their contention that the necessary foreign proceeding fails to exist. *See In re Tam,* 170 B.R. 838 (Bankr.S.D.N.Y.1994) (Garrity, J.) ("*Tam*"); *In re Master Home Furniture Co.,* 261 B.R. 671 (Bankr.C.D.Cal.2001) ("*Master Home*"). Neither causes this Court to hold as they urge on the facts presented here.

In *Tam,* Judge Garrity of this Court held that the voluntary winding up of a Cayman Islands Corporation was not a foreign proceeding within the meaning of section 101(23). He found that the winding up was characterized by insufficient judicial or administrative supervision, as it was "conducted without any regulatory oversight and virtually no creditor participation." 170 B.R. at 843.

Here, by contrast, there is exactly the "regulatory oversight" and opportunity for creditor participation that was lacking in *Tam.* As noted, the Polish court has held hearings and examined witnesses. It appointed an examiner to undertake specific areas of investigation and report back to the court. Its decision, if adverse to Netia, can be appealed. It has had the power to issue supplemental injunctions, akin to those that were sought in Chapter XI cases under the former Act before the enactment of Rule 11–44, though none has yet been required. It has offered the opportunity for creditors to oppose Netia's application there, though so far Netia's efforts in Poland have seemingly engendered little or no opposition.[66] All of these factors distinguish this situation from the situation Judge Garrity addressed in *Tam,* and dictate a different conclusion, on the facts.

Indeed, Judge Garrity himself distinguished *Tam* in another decision, two years later, also considering section 304(a). *See In re Ward,* 201 B.R. 357, 361–362 (Bankr.S.D.N.Y.1996). There Judge Garrity held the voluntary winding up of Zambia Airways to be a foreign proceeding even though it did not involve a proceeding in court at all. *Id.* at 361. Active court supervision of the voluntary winding up; ready access to the High Court and appel-

---

**63.** *See* page 14 above.

**64.** In determining whether a tribunal provides the level of judicial supervision necessary to pass muster as a judicial proceeding, it is not, in this Court's view, whether parties actually *go* to court to enforce rights afforded to them that is significant; it is the extent to which the court is open to them if they want to.

**65.** Likewise, the Court is not persuaded by the facts urged by the Moving Bondholders,

which it also takes as true, that at this stage the Polish court does not oversee the business operations of the Polish debtor, and does not have an automatic stay. Neither is a requirement to be found anywhere in section 304.

**66.** Of course, it would turn section 304 doctrine on its head to disqualify a foreign proceeding from status as such here by reason of lack of controversy in the proceeding abroad.

late courts by creditors and contributories; the right of creditors and contributories to be heard in proceedings, and rules and procedures consistent with U.S. notions of due process combined to distinguish that case from *Tam*, and warrant treatment as a foreign proceeding under section 304(a). *Id.* at 362. The showing Netia has made here—in the way of specific rights afforded to parties in interest and, of course, actual judicial activity and potential appellate review—is considerably stronger than the showing Judge Garrity found to be sufficient in *Ward*.

Similarly, former Chief Judge Brozman of this Court distinguished *Tam*, and followed *Ward*, in her 1999 decision in *Hopewell I. See* 238 B.R. at 49–52. She did so even though the Bermuda arrangement proceeding then before her involved a stand-alone scheme of arrangement, and did not exist in tandem with another statutory vehicle for debt manipulation, such as a voluntary liquidation, administration, or court-ordered winding up. *Id.* at 48. She thus held that it qualified as a foreign proceeding, notwithstanding a level of activity in the Bermuda court that again appears to be less than that here. *Id.* at 52 ("There are two mandatory court ap-

pearances.... That is two more than in the creditors' voluntary liquidation in the *Ward* case").[67]

Judge Chin of the district court expressly considered this aspect of Judge Brozman's decision on appeal in *Hopewell II*, when he affirmed her "lengthy and thorough" decision, 275 B.R. at 703–704, after devoting specific attention to her determination with respect to whether the Bermuda proceeding was a "foreign proceeding." *Id.* at 707–708. In particular, his conclusion was informed by the facts that the Bermuda scheme of arrangement was "subject to court supervision," and the "Bermuda court remained available." *Id.* at 706–708.[68]

While the Moving Bondholders ask this Court to apply *Master Home* to the facts here, this Court believes that it should not do so. There, after a lawsuit had been commenced in California Superior Court to foreclose on collateral securing a loan—stock of a U.S. corporation, Master Home Furniture USA ("MHUSA"), that had been pledged as security for a bank group—the Taiwanese parent Master Home Furniture Ltd. ("MHF") filed a petition for reorganization under the Compa-

---

67. In *Hopewell I*, Judge Brozman also took into account the fact that both hearings required the Bermuda court to review materials submitted to it and evaluate them, 238 B.R. at 52, but here the Polish court would do the same thing, and it examined witnesses and would look to the advice of an examiner as well.

68. In another recent decision in a section 304 case, *MMG, supra*, Chief Judge Bernstein was asked to provide assistance to a Cayman Islands insolvency proceeding, which had commenced with the filing of a petition with a Cayman Islands court and the issuance by that court of an ex parte provisional order granting MMG various kinds of interim relief "before making an order for winding up the company." 256 B.R. at 548. He too was asked to consider an argument that the pro-

ceeding then before him failed to meet the requirements for a "foreign proceeding" within the meaning of section 304(a). After noting that the phrase "foreign proceeding" is to be broadly construed, *id.* at 549, he rejected the argument. Finding the Cayman Islands proceeding to be the requisite insolvency proceeding, he stated:

> MMG intends to accomplish its goal through a judicial process overseen by the Grand Court in which creditors may participate. The fact that an out of court workout may ultimately serve the best interests of creditors is true in every insolvency case ... and does not alter the conclusion that the Cayman Islands case is a "foreign proceeding."

*Id.* at 550.

ny Law of Taiwan. At the time the matter came before the U.S. bankruptcy court in *Master Home*, the reorganization application was pending but had not yet been granted. After reviewing the evidence before it, the *Master Home* court ruled that the Taiwanese proceeding there did not qualify as a foreign proceeding under section 304(a). The *Master Home* court did so in light of a number of facts, including those that the Taiwanese investigative procedure required to determine whether reorganization would be permitted would take six to nine months to complete, 261 B.R. at 675; that the Taiwanese interim decree prohibited the bank group from seeking payment but did not prevent MHF from paying its trade creditors while the reorganization application was pending, *id.* at 676; that there was no judicial or administrative oversight of the business operation of the corporation, *id.* at 676, 677; and that the Taiwanese interim decree was not equivalent to the protection of the automatic stay in the United States. 261 B.R. at 677.

Netia and the Ad Hoc Committee argue that *Master Home* is both distinguishable and (though each says so subtly) wrongly decided, noting, with respect to the latter point, that the above factors, while relevant to a determination under section 304(c), are not relevant to a determination under sections 304(a) and 101(23). This Court believes that it should decline to extend *Master Home* to the facts presented here, and has no need to fully explore the latter point.

As a factual matter, as the Ad Hoc Committee notes,[69] the *Master Home* court had found as a fact that "while an application for reorganization is pending in Taiwan, no [court] oversight exists." *See* 261 B.R. at 677. Here, however, this Court has made what amounts to the opposite factual finding—that while an application for an Arrangement Proceeding is pending, there is material and substantial court involvement, and opportunity for creditors to be heard.[70] This Court agrees with Netia[71] that given creditors' ability to be heard and the Polish Court's substantial involvement—including conducting hearings and examining witnesses—in the Arrangement Proceeding currently underway in Poland, the Arrangement Proceeding allows for, and has already involved, considerably more involvement on the part of the court and creditors than the Taiwanese proceeding in *Master Home*.[72]

As a legal matter, this Court has some doubt as to whether the *Master Home* court would decide this case as it decided the petition of MHF if the *Master Home* court were deciding this case now and was subject, as this Court is, to the law in the Southern District of New York and Second Circuit.

*Master Home* cited *Tam* and *Hopewell I* and spoke of the level of involvement and supervision of the foreign court and the degree of access to the court available to creditors, so they could voice any objections they might have. *See* 261 B.R. at 675. However, it did not deal with other cases in the Southern District of New York, *Ward, MMG,* and (for understanda-

---

69. Ad Hoc Comm. Br. 5.

70. See page 14 above.

71. Netia Br. at 17.

72. It is also the case that the six to nine months that it took to get the MHF insolvency proceeding underway in Taiwan was a much longer time than the period of just a few weeks here, and the cases can also be distinguished by the broader authority under Polish law to enjoin *any* obligation that would hinder the debtor's ability to reorganize, and not just certain specified creditors, as was apparently the case under Taiwanese law.

ble reasons, as it was not decided yet) *Hopewell II*, and considered facts that those other courts (and *Hopewell I*) had held to be sufficient to warrant section 304(a) status to be insufficient in *Master Home*. Upon examination of the cases in this district after *Tam*, particularly in combination, a pattern emerges. *See Ward*, 201 B.R. at 361; *Hopewell I*, 238 B.R. at 50; *MMG*, 256 B.R. at 550; *Hopewell II*, at 706–07. In determining that the requisite level of judicial involvement and supervision existed and that creditors had access to the court (which requirement was not met in *Tam*, but was met in each of the other cases), the courts in this district have, as *MMG* directs, construed section 304(a) broadly, and have provided assistance to foreign judicial proceedings with considerably less judicial involvement and supervision than that in *Master Home* (or here).

As previously noted, Judge Garrity distinguished his own *Tam* decision in *Ward*, finding the Zambia Airlines winding-up in *Ward* to pass section 304(a) muster, even though it "is not strictly a judicial proceeding." 201 B.R. at 361. In *Hopewell I*, Judge Brozman (later affirmed by Judge Chin in *Hopewell II*) found "significant judicial involvement" in the Bermuda scheme process there before her, based on only two court appearances ("two more than in the creditors' voluntary liquidation in the *Ward* case"); 238 B.R. at 52, court review and evaluation of materials submitted to it, *id.*; and the fact that creditors had "a plethora of opportunities to object

to the scheme before it was sanctioned...." *Id.*

■ The cases in this district have never disqualified a proceeding from section 304(a) status based on the lack of an automatic stay, or because the foreign court would not supervise or administer the business operation of the company. Section 304(a) makes no mention of those as requirements; under those circumstances, this Court believes it to be inappropriate to judicially craft such requirements now.[73]

This Court, sitting in the Southern District of New York, considers it appropriate to analyze the section 304(a) issues as did its brother and sister judges in this district, and considers it inappropriate to apply or extend *Master Home* in a way that would be inconsistent with those decisions.

■ The Second Circuit has held that the purpose of section 304 "is to provide a statutory mechanism through which United States courts may defer to and facilitate foreign insolvency proceedings." *In re Treco*, 240 F.3d 148, 156 (2d Cir.2001). The ruling the Moving Bondholders seek, in addition to ill-serving that purpose, would also risk, if not ensure, running afoul of another purpose of section 304 proceedings identified by the Second Circuit: "to prevent piecemeal distribution of a debtor's estate." *Id.; see also In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 358 (2d Cir.) (same), *cert. denied*, 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992);[74] *In re Caldas*, 274 B.R. 583, 591 (Bankr.S.D.N.Y.2002) (Gerber, J.) ("Section 304 allows the foreign represen-

---

73. For that reason, this Court need not reach Netia's point that in considering those factors, the Master Home court, "[i]nstead of limiting its analysis to the question of whether there was a foreign proceeding," "engaged in what can only be understood as an analysis under § 304(c) as to whether § 304(b) injunctive relief was appropriate." This Court will limit its examination to the factors recognized in this district as relevant to section 304(a),

without prejudice to any rights the Moving Bondholders may have with respect to the lack of an automatic stay or supervision of business operations of any of the foreign debtors, under section 304(c).

74. *Treco* was a section 304(c) case and *Koreag* was principally a section 304(b) case, but the quoted principles are no less relevant, in this Court's view, to a case where the issue pre-

tative to prevent creditors from grabbing local assets, and expedite the orderly and equitable distribution of the foreign estate"). This Court agrees with the Ad Hoc Committee [75] that applying or extending *Master Home* to a case like this one would "result in a run at a debtor's assets located in the United States immediately upon the filing of an application for relief in a foreign venue."

In a district where the caselaw holds that section 101(23) is to be broadly construed, and where there is a long history of providing comity to foreign proceedings where the requirements of section 304(c) are otherwise satisfied, this Court believes that the interests of section 304 policy would be ill served by ruling that the

Polish Arrangement Proceeding here is undeserving of this Court's assistance. After the threshold showings required by section 101(23) and the caselaw in this district have been made, the kinds of proceedings that then do not warrant assistance can be, and in this Court's view, more appropriately are, weeded out by application of the section 304(c) factors.[76]

### Conclusion

For the foregoing reasons, the Moving Bondholders' motion is denied.

SO ORDERED.

---

sented is under section 304(a). The purposes of section 304 as a whole would be frustrated if foreign proceedings deserving of assistance in the United States bankruptcy courts were locked out by reason of overly restrictive interpretations of section 304(a). Any concerns as to the propriety of granting comity, and/or the breadth of relief to be afforded, can easily be dealt with by a court's appropriate exercise of its discretion under sections 304(b) and 304(c). *See Treco* at 154 ("[t]hese guidelines are designed to give the court the maximum flexibility in handling ancillary cases.... [T]he court [should] make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules.")

**75.** Ad Hoc Comm. Br. at 6.

**76.** Triage makes an additional point which this Court has considered, but rejects. After joining with SISU with respect to the 101(23) argument discussed above, Triage argues that Netia has also failed to meet the requirements of section 101(24), for a "foreign representative," by reason of an asserted failure to show that the filing of the petition here was duly authorized.

The petition in this Court was verified by each of Messrs. Blom, Hochman, Don–Siemion, Piwowarczyk, Chmielewski, and Wojcieszek, "being members of the management board"

of each of Netia Holdings, Netia Telekom, and Netia South. It is well established, at least in this district, that the members of a board of directors of a foreign corporation may commence a section 304 proceeding in the United States on the debtor's behalf. *See Hopewell I,* 238 B.R. at 53 (rejecting argument that "a board of directors cannot be a foreign representative"; noting that "absolutely nothing in the statute requires the foreign representative to be appointed by the court"; and stating that such a construction would render the definition of "foreign proceeding" "nonsensical inasmuch as a 'foreign proceeding' is defined to include non-judicial proceedings"). The filing by the members of a foreign debtor's board of directors is exactly analogous to the filing of a chapter 11 petition on behalf of a debtor in possession. There has been no showing by Triage that the Petitioners were unauthorized, under Polish law, to take such an act on behalf of the corporation for which they are board members. While it might have been better for the Petitioners to make an express representation in their petition here that they were duly authorized, or to attach the Polish analog of a certificate of a board resolution to evidence that, Triage has failed to put forth any evidence that they were not, or otherwise to raise an issue of fact in this regard. On the record here, this Court has no basis for finding, either as a fact or conclusion of law, that they were unauthorized to file the Foreign Debtors' petitions here.