**In re the Petition of Theo BULLMORE and Simon Whicker as Joint Official Liquidators for National Warranty Insurance Risk Retention Group, d/b/a National Warranty Insurance Company and National Warrant Insurance Group, Debtor in Foreign Proceedings.**

No. BK03–42145.

United States Bankruptcy Court.
D. Nebraska.

Aug. 19, 2003.

Krista L. Kester, Joseph Badami, Michelle Paxton, Lincoln, NE, for Joint Official Liquidators of National Warranty Insurance Risk Retention Group.

Clay Rogers, Omaha, NE, John L. Smaha, Smaha & Daley, San Diego, CA, Jay L. Westbrook, The University of Texas at Austin School of Law, Austin, TX, for Phyllis Hoffman.

Martin P. Pelster, Omaha, NE, William Choslovsky, Karl Halperin, Chicago, IL, for Commonwealth Dealers Life Insurance Company.

Donald L. Swanson, Christopher J. Basilevac, Omaha, NE, for Consumer Automotive Consultants, LLC.

John M. Guthery, Lincoln, NE, for American Safety Reinsurance Ltd.

Donald R. Rector, Dallas, TX, for SC & E Administrative Services, Inc.

George Kurisky, Houston, TX, for Vista Group.

Justin O'Toole Lucey, Mount Pleasant, SC, for Johnny's Enterprises, Inc.

## MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Trial was held in Omaha, Nebraska, on August 5, 2003, on the petitioners' motion for temporary restraining order (Fil.# 2) and objections by Phyllis Hoffman (Fil.# 10) and Johnny's Enterprises, Inc. (Fil.# 14). Joseph Badami, Krista Kester, and Michelle Paxton appeared for the Joint Official Liquidators; John Smaha, Clay Rogers, and Jay Westbrook appeared for Phyllis Hoffman individually and others similarly situated; Justin Lucey appeared for Johnny's Enterprises, Inc.; Martin Pelster, William Choslovsky, and Karl Halperin appeared for Commonwealth Dealers Life Insurance Company; Don Swanson and Christopher Basilevac appeared for Consumer Automotive Consultants, L.L.C.; John Guthery appeared for American Safety Reinsurance, Ltd.; Donald Rector appeared for SC & E Administrative Services, Inc.; and George Kurisky appeared for Vista Group. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A).

National Warranty Risk Retention Group ("National Warranty") is incorporated under the laws of the Cayman Islands with its principal place of business in Lincoln, Nebraska. It was apparently created under the provisions of 15 U.S.C. § 3901 of the Liability Risk Retention Act. That statute authorizes the creation of companies which are to be incorporated in and regulated by foreign jurisdictions, but which are authorized to sell product liability insurance in the United States, not to individual consumers, but to certain groups as defined by the statute. Since 1984, National Warranty has continued to be incorporated under the laws of the Cayman Islands, and it has been administered by a Cayman Islands company, Crusader International, and regulated by the Cayman Islands Monetary Authority.

The principal activity of National Warranty consists of operation as a risk retention group. As a risk retention group, National Warranty primarily insured group members who were obligated to contract holders that had purchased Vehicle Service Contracts ("VSCs") from those group members ("Obligors"). The group members consisted of manufacturers, administrators, and automobile dealerships. As of March 2003, National Warranty had approximately five hundred eighty (580) group members.

The federal statute referred to above, 15 U.S.C. § 3901 *et seq.*, basically allows risk retention groups operating under that statutory section to be recognized by federal and state law as an insurance company, but restricts the scope of state insurance company regulatory activity over the affairs of the risk retention group. Under the laws of the Cayman Islands, National Warranty is an insurance company. Under the laws of the United States, the individual states, which otherwise regulate domestic insurance companies which are licensed to do business in each state, have very limited authority over the business activities of entities such as National Warranty.

The VSCs that were issued by the various group members are more commonly known as Extended Warranty Agreements. When purchasing a new or used automobile, a consumer has the opportunity, presented by the automobile dealership, to purchase a contract to cover some or all repair costs on the various mechanical items associated with a motor vehicle. Covered items may include transmissions, drive train, and engine components. The dealer that sells the VSC has obtained it from a marketing group authorized under the Risk Retention Act, 15 U.S.C. § 3901 *et seq.* That marketing group has contracted with National Warranty to ultimately "insure" that when a consumer brings a vehicle into an authorized dealership for repair, the dealer may submit information concerning the needed repair to the administrator of the Vehicle Service Contract and obtain approval for the repairs and assurance that the administrator will pay for the repairs pursuant to the terms of the VSC.

The dealer then completes the repairs, submits a claim to the administrator on behalf of the consumer and awaits payment. The administrator of the VSC then pays the claim out of a fund created from a portion of the accumulated premiums received from the purchasers of the VSCs. Such payment funds are referred to as "reserves."

From the National Warranty side of the transaction, National Warranty contracts with a group that creates and markets the Vehicle Service Contract. When the initial contract concept is submitted to National Warranty, an analysis is completed at National Warranty to enable National Warranty to determine the price it must

receive to cover administrative costs and create the appropriate contribution to the reserve account which may eventually be called upon to pay the claim. National Warranty does not set the price of the Vehicle Service Contract. Either the marketing group or the dealership sets the initial price. When the contract is sold and the payment made to the dealership or the marketing group, all or part of the contract price (premium) is paid to National Warranty. National Warranty then distributes to the marketing group and/or the dealership a commission and an amount to be used as the reserve account. National Warranty keeps a portion for its administrative costs, and if it has contracted to handle the complete administration of the VSCs, it either takes possession of the reserve account held by the marketing group or it creates its own reserve account. In any event, when legitimate claims are made and authorized for payment, there should be sufficient funds in either the marketing group's reserve account or in a separate reserve account owned by National Warranty to enable payment of the claims.

During 2002 and early 2003, National Warranty got involved in disputes with one or more groups concerning the administration of the VSCs and the adequacy or inadequacy of reserve accounts held by the marketing groups and National Warranty. The disputes became so significant that certain members/marketing groups refused to allow their reserve accounts to be used to pay claims, and National Warranty determined that its reserve accounts were insufficient to permit it to pay claims for which it was directly liable.

After consultation with counsel in the United States and in the Cayman Islands, the officers of the company decided to file a proceeding in the Cayman Islands analogous to the filing of a Chapter 11 bankruptcy case in the United States. In early June 2003, shortly after a transfer of approximately $24,000,000, representing some or all of National Warranty's reserves held in the United States, to banks in the Cayman Islands, National Warranty filed a petition in the Grand Court of the Cayman Islands for an order winding up the company. An order was entered by the Grand Court appointing the petitioners, Simon Whicker and Theo Bullmore, chartered accountants with KPMG Cayman Islands, as Joint Provisional Liquidators of the company. It was their duty, under Cayman law, to review the status of the company, determine its solvency, and to make further recommendations to the Grand Court with regard to whether the company could be reorganized, or whether it should be liquidated. Under Cayman Islands law, the appointment of the Joint Provisional Liquidators terminated the authority of the directors of the company and put the operation of the company into the hands of the Joint Provisional Liquidators pending a final order.

On or about the same date as the order appointing the Joint Provisional Liquidators was entered, the Grand Court also entered an order enjoining certain actions against National Warranty. That order states: "Pursuant to section 99 of the Companies Law, all actions, suits or proceedings of any nature whatsoever against the Company be and are hereby restrained until further order of this Court, and no future action, suit or proceeding shall be commenced against the Company without the leave of this Court." (Ex. C. to § 304 Petition (Fil.# 1)).

Shortly after the appointment of the Joint Provisional Liquidators and the entry of the order referred to above, the Joint Provisional Liquidators filed this petition under 11 U.S.C. § 304 of the Bankruptcy Code, requesting injunctive relief

against the initiation or continuance of actions against the debtor with respect to property involved in the Cayman proceeding and relief against the commencement or continuation of any judicial proceedings. This court entered an ex parte temporary restraining order providing for notice and an opportunity to be heard at a hearing scheduled within ten days of the entry of the temporary restraining order. Two objections were filed with regard to the temporary restraining order and its continuance or its conversion into a preliminary or permanent injunction. One of the objections was filed on behalf of Phyllis Hoffman, the purchaser of a VSC, and all persons similarly situated to her. By consent of counsel for the Joint Provisional Liquidators and counsel for Ms. Hoffman, the hearing on the injunctive relief was continued to August 5, 2003. Between the time originally scheduled for the hearing and August 5, 2003, several other parties filed objections or resistances to the entry of the injunctive relief generally, and, in some cases, the objection requested that the injunctive relief, if entered, be limited so as not to affect the rights of the objecting parties.

Trial was held on the injunctive relief question on August 5, 2003. Documentary evidence was submitted and oral argument presented.

The parties all agree that, for the purposes of the litigation pending in this court, the injunctive relief entered by the court of Grand Cayman does not have extraterritorial effect. In other words, although the order is effective with regard to causes of action pending or to be commenced in the Cayman Islands, the order is not enforceable against actions pending or to be commenced in the United States. Litigation has been threatened by numerous parties, including Ms. Hoffman, who has prepared a complaint to be filed in the state courts of the State of Nevada, requesting class action status concerning a number of causes of actions or claims for relief, including breach of contract, fraudulent misrepresentation, negligent misrepresentation, and statutory torts under the Nevada laws.

On August 1, 2003, the Grand Court, after notice and hearing, entered an order converting the case in the Cayman Islands from a provisional case to a liquidation case. The court then appointed the same individuals as the Joint Official Liquidators, giving them full power under the laws of the Cayman Islands with regard to gathering assets of National Warranty and liquidating the assets for the benefit of the creditors.

■ It is the position of the Joint Liquidators that being required to employ the services of counsel in the United States in various state and federal jurisdictions to defend contract and tort lawsuits would be extremely costly, time consuming, and would impose irreparable harm upon National Warranty's liquidation process. Because the injunctive relief granted in the Cayman Islands does not have any effect in the United States, the Joint Liquidators have invoked the powers of the United States Bankruptcy Court pursuant to 11 U.S.C. § 304 to obtain relief, which would protect the assets of the debtor during the pendency of this liquidation process in the Cayman Islands. Section 304 of the Bankruptcy Code is a special provision under Title 11 of the United States Code which enables a representative of a reorganization or liquidation case pending in a foreign jurisdiction to obtain injunctive and other relief in the United States during the pendency of the foreign proceeding.

■ A petition filed under Section 304 does not create a true bankruptcy case in the United States. The filing of such a petition does not trigger an automatic stay

such as a voluntary or involuntary petition under Section 301 or 303 of the Bankruptcy Code would. The filing of such a petition does not authorize the appointment of a trustee or a creditors' committee, nor does it create a mechanism for the filing and adjudication of claims against the estate. Finally, the filing of such a petition under Section 304 does not give the petitioner any of the powers of a trustee which automatically come into effect upon the filing of a petition under Section 301 or 303.

 What the filing of the petition under 11 U.S.C. § 304 does, however, is give the foreign representative the right to request help from a bankruptcy court. It allows the bankruptcy court to exercise jurisdiction and fashion a remedy which will "acknowledge that the foreign court presiding over the original proceeding is in the better position to decide when and where claims should be resolved in a manner calculated to conserve resources and maximize assets .... Section 304 allows the foreign representative to prevent creditors from grabbing local assets, and expedite the orderly and equitable distribution of the foreign estate." *In re Caldas,* 274 B.R. 583, 591 (Bankr.S.D.N.Y.2002) (quoting *In re MMG LLC,* 256 B.R. 544, 549 (Bankr.S.D.N.Y.2000)).

 A case under 11 U.S.C. § 304, ancillary to a foreign proceeding, is commenced by the filing of a petition by a foreign representative. The section then identifies the relief which the court may grant and directs the court to consider numerous factors when determining whether to exercise the jurisdiction and grant the relief requested. The substance of Section 304 follows:

(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—

(1) enjoin the commencement or continuation of—

(A) any action against—

(i) a debtor with respect to property involved in such foreign proceedings; or

(ii) such property; or

(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;

(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or

(3) order other appropriate relief.

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

Subparagraph (6) of 11 U.S.C. § 304(c) would apply to an individual and therefore is not applicable to this proceeding.

The Objector, Ms. Hoffman, suggests that Section 304 is inappropriately invoked in this case. The evidence is clear and uncontested that the only legal or factual connection between National Warranty and the country of the Cayman Islands is the registration or incorporation of National Warranty in the Cayman Islands and the regulation of it under Cayman Islands law by governmental or quasi-governmental administrative and regulatory authorities. By Cayman law, National Warranty is registered as a "exempt" company. The designation as "exempt" in the context of this case means that National Warranty, although registered or incorporated and regulated by Cayman Islands law, is prohibited from doing business in the Cayman Islands. National Warranty has done all of its business in the United States since the day it was created. Until late May 2003, when it transferred approximately $24,000,000 to banks in the Cayman Islands, all of its financial and hard assets were located in the United States, mainly in Lincoln, Nebraska. All of the entities for which it provided insurance, its members, are located in the United States. All of the Vehicle Service Contracts which it administers and for which it has provided insurance to its members, were entered into in the United States and are subject to the laws of the various states.

It is the position of the objecting party that National Warranty is really not a foreign entity and therefore the Joint Liquidators are not "foreign representatives" as that term is used in 11 U.S.C. § 304 and 11 U.S.C. § 101(24).

The Bankruptcy Code at 11 U.S.C. § 101(23) defines a "foreign proceeding" as a proceeding whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

The Objector argues that, as a matter of law, the terms "domicile" and "residence" as used in 11 U.S.C. § 101(23) have application only to individuals, because corporate entities are not generally deemed to have a "domicile" or "residence." Because the principal place of business and principal assets of National Warranty were located in Lincoln, Nebraska, at the time of the commencement of the Cayman Islands proceeding, and because Section 101(23) does not include place of incorporation or registration as a qualification for jurisdiction within the definition of a "foreign proceeding," it is the position of the Objector that there is no legitimate "foreign proceeding" and this petition under 11 U.S.C. § 304 should be dismissed.

Alternatively, the Objector argues, as a matter of fact and law, that the Cayman Island law is so different from or inconsistent with United States bankruptcy law that, contrary to section 304, creditors of National Warranty will not be able to receive just treatment, protection against prejudice and inconvenience in the processing of their claims, or appropriate distribution of proceeds of the estate substantially in accordance with the Bankruptcy Code, and there will be no ability of the creditors to prevent preferential or fraudulent dispositions of property of the estate. Therefore, the Objector argues the requirements of 11 U.S.C. § 304(c) cannot be complied with and the court should decline to grant the relief requested.

Addressing first the assertion that the debtor is actually a United States company with assets located in the United States and creditors located in the United States, and therefore Section 304 relief should not be accorded to the Joint Liquidators, the question of "domicile" must be reviewed.

The Objector, Ms. Hoffman, presented the declaration of Gabriel Moss, Q.C., a member of the English Bar who regularly advises on matters of English law and the law of English-law-based jurisdictions, particularly with respect to corporate and insolvency law. Mr. Moss has extensive experience, and since 1978 has specialized, in business and financial law with particular specialty in insolvency and insolvency-related matters. He has written extensively on insolvency issues and has authored or co-authored chapters on "cross-border issues" and "cross-border enforcement and the conflict of laws" in texts published in England. He has acted as lead counsel and appeared in court in connection with virtually every major insolvency in or affecting the English jurisdiction between 1989 and the present. Mr. Moss has been specially admitted to act in insolvency and insolvency-related matters in Bermuda, Cayman, Hong Kong, The Isle of Man, and generally admitted in Gibraltar and has appeared as counsel in the courts of those jurisdictions. He has testified in U.S. federal courts in New York, Florida, and California with expert evidence in relation to English or English-based law related to insolvency and schemes of arrangements.

According to Mr. Moss, British Q.C.s are often brought in to advise and act as lead counsel in matters of Cayman law because of the similarity of Cayman law and procedure to older forms of English law and procedure. The final court of appeals for Cayman is the Judicial Committee of the Privy Council in London, most of the members of which are also members of the Judicial Committee of the House of Lords, which is the final court of appeal for the United Kingdom. According to Mr. Moss, the judge-made case law for Cayman is likely to be very similar to case law in England. In that respect, he recently was local counsel in the Court of Appeal in Cayman in the matter of *Waterford Insurance Ltd. and Others* (Civil appeal No. 2 of 2003). In short, Mr. Moss is certainly qualified to testify as an expert witness concerning English and Cayman law.

Mr. Moss, in paragraph 26 of his Declaration (Fil.# 46), acknowledges, "The traditional English case-law approach is that '... the principal winding up should be in the principal domicil of the corporation...' .... This has traditionally meant the place of incorporation ...." (internal citations omitted).

However, Mr. Moss suggests that the place of incorporation as the principal domicile (or domicil, as the term is used by Mr. Moss) no longer makes sense in the modern business context where, according to Mr. Moss, the place of registration is often chosen for tax and regulatory reasons and may have no real connection with the business, assets or creditors. Recently, the "old approach" has been swept away within the European Union. A European Union regulation provides "that where debtor's 'centre of main interests' is within the EU, main proceedings in the EU can only take place in the country which has the debtor's 'centre of main interests', wherever in the world the debtor is registered." Moss Decl. at ¶ 26. Mr. Moss goes on to say, "There is a presumption that the centre of main interests of a corporation is in the place of registration, but that can be overcome by evidence of the real position." *Id.*

At paragraph 27 of his Declaration, Mr. Moss acknowledges that "[t]he EC Regula-

tion does not apply to offshore jurisdictions which have English law based systems such as Cayman." Nonetheless, he suggests that "such jurisdictions should look at the realities and in appropriate cases act in a secondary capacity even where the corporation is registered locally." *Id.* He gives an example of a case which had a pending Chapter 11 in the United States and in which the Bermudan court and Cayman court acknowledged that they should cooperate with courts in other jurisdictions, even though the company was ostensibly registered in either Bermuda or Cayman.

Mr. Moss concludes that "there is nothing in Cayman law to prevent the Cayman courts using their procedures in a way ancillary to a main proceeding in the U.S. . . . ." Moss Decl. at ¶ 28. According to Mr. Moss, "This would avoid the hardship to creditors with relatively small claims of having to have their claims dealt with in Cayman and the additional expense of Cayman JPL's having to sue abroad to realise assets." *Id.*

In a similar vein, co-counsel for Ms. Hoffman, Jay L. Westbrook, presented oral and written argument concerning a number of matters before the court, including the question of the appropriateness of acknowledging and deferring to the Cayman case, solely based upon the fact that Cayman is the place of registration or incorporation of National Warranty. Mr. Westbrook is a well-known and acclaimed professor at the University of Texas Law School and author of books and articles on bankruptcy, and the United States Reporter for the American Law Institute's Transnational Insolvency Project, which has recently published *Transnational Insolvency Project: Principles of Cooperation in Transnational Insolvency Cases Among Members of the North American Free Trade Agreement* (2003); and *International Statement of United States Bankruptcy Law* (2003).

Mr. Westbrook's Declaration, which this court shall consider only as an argument and brief and not as evidence, is found at Filing No. 50. Mr. Westbrook argues that there is no language in Section 304 of the Bankruptcy Code which mentions place of incorporation as a qualifying jurisdiction. He argues that because the debtor is an "all-American company," with nothing except its technical incorporation in Cayman, there is no need for a foreign proceeding involving the debtor, and there is no need for this court to treat the Cayman proceeding as a "foreign proceeding" for bankruptcy purposes. He suggests that a better resolution for National Warranty would be a filing under the Bankruptcy Code or a state insurance conservatorship in Nebraska, where National Warranty has its principal office.

In support of his argument, Mr. Westbrook informs the court that the consensus of the American Law Institute, as well as the pending Chapter 15 of the Bankruptcy Code, which, if enacted, will replace Section 304, is that Section 304 was intended to apply only to proceedings in a debtor's home country. Chapter 15 defines a "main" proceeding as a foreign proceeding pending at the "center of main interests" of the debtor. He acknowledges that, even in the proposed Chapter 15, there is a presumption that the place of incorporation is that "center," but asserts that the presumption is rebuttable. In other words, Mr. Westbrook suggests that the proposed Chapter 15 and a published position of the American Law Institute adopt the test that has now been adopted by the European Union, as testified to by Mr. Moss.

 With full and complete acknowledgment of the expertise of Mr. Moss and Mr. Westbrook, and with appre-

ciation for their invitation to this bankruptcy court to take the National Warranty case as an opportunity to fashion new law in the bankruptcy courts for the United States with regard to cross-border insolvencies, the invitation is respectfully declined.

Neither the "centre of main interests" as defined under European law nor the "center of main interests" as defined by the ALI and the proposed Chapter 15 of the Bankruptcy Code represents the current state of the law in the United States with regard to the definition of "domicile" of a corporation under United States law.

In bankruptcy cases, "a corporation's domicile is the state of incorporation." *Underwood v. Hilliard (In re Rimsat, Ltd.)*, 98 F.3d 956, 960 (7th Cir.1996). That determination by the Court of Appeals for the Seventh Circuit follows an articulation of the law of the United States which began with *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 10 L.Ed. 274 (1839). In that case the Supreme Court stated:

> It is very true that a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and by force of law; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty.

*Bank of Augusta*, 38 U.S. at 588.

The Eighth Circuit Court of Appeals recognizes the principle that a corporation has a "domicile" and that the domicile is the place of incorporation. *United States v. Orshek*, 164 F.2d 741, 742 (8th Cir.1947). In addition, Restatement (Third) of Foreign Relations Law § 213 (1987) provides, "For purposes of international law, a corporation has the nationality of the state under the laws of which the corporation is organized."

As explained above, National Warranty was incorporated in the Cayman Islands in 1984. It has continually maintained its status as a Cayman Islands company since that date and was a Cayman Islands company upon the filing of the winding-up petition on June 4, 2003. It has been administered by a Cayman Islands entity, Crusader International, and regulated by the Cayman Islands Monetary Authority. Applying current United States law, I find that the Cayman Islands is the domicile of National Warranty.

In addition to the case law discussed above concerning the appropriate domicile of a corporate entity, the Congress of the United States in 1981 passed a law specifically authorizing companies such as National Warranty to form in the Cayman Islands and transact business in the United States as a risk retention group. The Liability Risk Retention Act, 15 U.S.C. § 3901 *et seq.*, authorized risk retention groups domiciled outside of the United States to provide insurance to certain industries in the United States. Congress also provided that companies such as National Warranty which are registered in the Cayman Islands would be exempt from state regulation if chartered before December 31, 1984, and meeting the minimum requirements of at least one state prior to that date. 15 U.S.C. §§ 3901, 3902; *see also* H.R.Rep. No. 97–190, at 10–11 (1981), U.S.Code Cong. & Admin.News 1981, 1432, 1438–1440. At the time of the passage of the Risk Retention Act, the Bankruptcy Code, including Section 304, was already in effect. At no time has Congress amended Section 304 of the Bankruptcy Code or the Risk Retention Act to exclude companies such as National Warranty, registered in the Cayman Islands under the auspices of the Risk Re-

---

tention Act, from the benefits of Section 304.

The domicile of National Warranty is in the Cayman Islands. There is now pending in the Cayman Islands a "foreign proceeding" as that term is used in the Bankruptcy Code. The Joint Liquidators, petitioners herein, are "foreign representatives" of that "foreign proceeding," and the petition filed by the Joint Liquidators under 11 U.S.C. § 304 of the Bankruptcy Code appropriately invokes the jurisdiction of the United States Bankruptcy Court for the District of Nebraska.

The Joint Liquidators have requested broad relief in the form of an injunction similar to the relief that could be obtained by the filing of a Chapter 11 petition under the Bankruptcy Code and the automatic stay that comes into effect upon the filing of such a petition pursuant to 11 U.S.C. § 362(a).

The traditional standard for imposing injunctive relief is found in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981):(1) the threat of irreparable harm to the movant, (2) the balance between such harm and the injury that granting the injunction will inflict on other parties, (3) the likelihood that the movant will succeed on the merits, and (4) the public interest.

Those factors are to be considered in conjunction with the factors in § 304(c):

In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; [and]

(5) comity[.]

11 U.S.C. § 304(c). *See also In re MMG LLC*, 256 B.R. 544 (Bankr.S.D.N.Y.2000).

The objecting parties suggest that having to pursue their claims against National Warranty in the Cayman proceeding would be a hardship for them. Some bankruptcy courts have fashioned a remedy in response to such concerns whereby claims are filed and determined in the United States. *See In re Caldas*, 274 B.R. 583 (Bankr.S.D.N.Y.2002) (claimant allowed to liquidate its claim in U.S. court, for further processing in the foreign proceeding, because Peruvian liquidation proceedings lack a procedure for adjudicating validity of disputed claims) and *In re Artimm, S.r.l.*, 278 B.R. 832 (Bankr.C.D.Cal.2002) (U.S. bankruptcy court allowed claims to be administered in U.S. and treated as if filed in a domestic Chapter 7 case, to protect claimants from prejudice and inconvenience of the claims process in an Italian bankruptcy case).

Such a procedure appears to be unnecessary here, however, because as discussed below, the Cayman statute provides for relatively uncomplicated claim filing and allowance procedures.

One of the elements required to be considered under section 304 when determining if the relief requested is appropriate, is "comity". "Comity" refers to the courtesy or respect of one political or judicial entity for the law of another jurisdiction. The United States Supreme Court defined comity as

neither a matter of absolute obligation on the one hand, nor a mere courtesy or goodwill, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895).

 The case of *In re Gee,* 53 B.R. 891 (Bankr.S.D.N.Y.1985), extensively discussed the concept of comity.

Comity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated. *Cunard Steamship [Co. Ltd. v. Salen Reefer Servs. AB],* supra, [773 F.2d 452] at 457 [(2d Cir.1985)]; *see Hilton v. Guyot,* 159 U.S. at 202–03, 16 S.Ct. at 158; *Clarkson Co. v. Shaheen,* 544 F.2d 624, 629 (2d Cir.1976); *Kenner Products Co. v. Societe Fonciere et Financiere Agache–Willot,* 532 F.Supp. 478, 479 (S.D.N.Y.1982). Particularly where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed. *Clarkson Co., supra,* 544 F.2d at 630.

*Gee,* 53 B.R. at 901.

 "The principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States." *Bank of New York v. Treco (In re Treco),* 240 F.3d 148, 157 (2d Cir.2001).

To support their position that the Cayman Islands law concerning liquidation of a company is similar to United States law and is deserving of recognition and comity, the Joint Liquidators presented expert testimony by Andrew John Jones, Q.C., (Queen's Counsel), and partner in the Cayman Islands law firm of Maples and Calder. Mr. Jones was born in England and educated at Cambridge University where he obtained an M.A. with Honours in Law. He has been a member of the bar in England and Wales since 1973. In 1984, he moved to the Cayman Islands and was admitted as an attorney at law. He was appointed to the rank of Queen's Counsel in April 2002. Mr. Jones informed the court that those who are appointed Queen's Counsel are considered "one of Her Majesty's Counsel learned in the law. Her Majesty the Queen grants the honour of the rank of Queen's Counsel on certain senior counsel appearing in Her Courts in recognition of their particular skill and expertise." *See* Jones Decl. at 17 n. 1 (Fil.# 67).

Mr. Jones has been in continuous practice in the Cayman Islands since joining the law firm of Maples and Calder in 1984 and is responsible for the firm's litigation department. His practice comprises the conduct of commercial litigation on behalf of institutions engaged in the financial services industry and advising the controllers of liquidators of banks, insurance companies and mutual funds incorporated in the Cayman Islands. His firm has also acted for foreign liquidators and U.S. government agencies, including the SEC and FSLIC (now called the Resolution Trust). Mr. Jones has extensive experience in cross-border insolvency matters and the variety of issues which arise from them. He has acted as an expert witness in proceedings in state and federal courts in the United States, including the U.S. Bankruptcy Court.

Mr. Jones is certainly qualified to testify as an expert witness concerning the provisions of the Cayman Companies Law which are similar to, and different from, the Bankruptcy Code with regard to liquidation proceedings in the Cayman Islands. As part of his Declaration, he provided commentary summarizing the various provisions of the Companies Law. He then provides, as a separate attachment to his Declaration, the various statutory provisions he has referred to in his commentary.

Based upon his commentary and a review of the statutory provisions he is commenting upon, his testimony is accepted as accurately describing the law and procedure in the Cayman Islands and the following paragraphs are a summary of the duties of the official liquidators and the procedure by which they undertake and accomplish their duties. Significant differences from the Bankruptcy Code and procedure are noted.

The official liquidators are officers of the Grand Court. They have, among other duties, the duty to act impartially and evenhandedly among different interests competing in the winding-up ("winding-up" is a term used to describe the activity of completing the business of the company, collecting its assets, liquidating its assets, determining the creditor group or groups, determining the priority of claims against the assets, and distributing the assets pursuant to statutory authority). The official liquidators owe fiduciary duties to the body of creditors as a whole. Once a winding-up order is made, then, pursuant to Section 101 of the Companies Law, no suit, action or other proceeding shall be continued or commenced against the company except with leave of the Grand Court and subject to such terms as the Grand Court may impose. The basic duty of the official liquidators is to collect all of the company's assets, liquidate those assets and apply them to the liabilities.

The official liquidators have certain statutory powers as defined in Section 109 of the Companies Law. However, even armed with the statutory powers, they are still under the control of the Grand Court. According to Mr. Jones, in practice, official liquidators will "almost invariably seek a specific direction from the Grand Court in respect of any decisions which are financially material or in any way controversial." Jones Decl. ¶ 20 at 6.

The official liquidators have the statutory power to bring and defend proceedings in the name of the company on behalf of the estate. (s. 109(a) of the Companies Law). They are not required to seek permission of the Grand Court to institute or defend such proceedings, but will often do so.

The proceeds of the estate will be distributed in accordance with a regime prescribed by the Companies Law. That regime, similar to but not exactly the same as bankruptcy law in the United States, provides that a secured creditor is entitled to enforce the security without leave of the court, except under limited circumstances.

Under s. 162 of the Companies Law, the Cayman Islands government has a preference with respect to taxes and statutory fees, and the company's employees have a preference with respect to certain salary arrears. However, the claims of revenue authorities in countries other than the Cayman Islands are not enforceable in a liquidation. This limitation on enforceability of tax claims may have an adverse effect on claims of the United States government or the various states with regard to tax obligations. No information has been provided in this Section 304 proceeding with regard to whether tax claims exist.

The costs and expenses of the liquidators and their agent are given priority with regard to payment over all other debts. Those costs are subject to determination by a committee of creditors, and the court acts in an appellate capacity in the event there is a disagreement. The liquidators are required to produce periodic reports to the court setting out details of their charges and the work done.

All ordinary unsecured creditors are treated equally, irrespective of the nature of their claims. Local creditors do not have any preference or priority over U.S. or other foreign creditors. This rule applies among unsecured creditors existing as of the date of the presentation of the winding-up petition or whose claims arise out of causes of action which accrued before the date of the presentation of the winding-up petition. Included are creditors whose claims against the company arise out of contract, common-law and statutory torts, equitable claims, etc. In addition, the Companies Law, at s. 112(2), recognizes that contractual rights of set-off are enforceable by and against the liquidators. In the absence of express or implied contractual rights, the law imposes set-off if, prior to the liquidation, there have been mutual credits, mutual debts or other mutual dealings between the company and any creditor of the company proving or claiming to prove for a debt in a liquidation.

When contingent claims become liquidated, thereby giving rise to liability, the claimant may submit a claim to liquidators who will then determine whether the claimant has a valid claim. On occasion, the liquidators will estimate the value of contingent claims for determining interim dividend distribution. This appears to be different from the rights accorded contingent claims under the Bankruptcy Code, but, as will be discussed, the law does allow the Grand Court to permit liquidation of contingent claims in other venues.

What might be considered under the bankruptcy law of the United States as a preferential transfer is dealt with by the Cayman Islands Companies Law somewhat differently from the treatment under the Bankruptcy Code. Under Cayman law, the essence of the fraudulent preference is that if the company, knowing it cannot pay all its debts in full, voluntarily and improperly makes a payment or gives a benefit to one creditor which will result in an inequality between that creditor and its other creditors, a preference can be adjudicated. There is no fraudulent preference if the payment is not given voluntarily. A payment can only be set aside as a fraudulent preference if the liquidators can establish it was made for an improper motive. In other words, as suggested by Mr. Moss in his declaration, and agreed with by Mr. Jones, the intent of the company at the time the payment was made is significant and an essential element of the process with regard to setting aside such payment.

There are provisions under the Cayman Fraudulent Dispositions Law (1996 Revision) to set aside dispositions of a company's property at less than fair value made with the intention of defeating the claims of creditors.

The process for filing claims and for a determination of the validity of the claim by the official liquidators is, at least initially, set up so there is very little burden upon the claimant. The claim form is ordinarily sent by mail to known creditors. There is no requirement for the claimant to appear before the Grand Court or the official liquidators, nor to employ the services of local attorneys. The claim must be submitted in writing using the official claim form. There is no authority for the claimant to seek to recover by bringing an

action outside of this process, without leave of the Grand Court. (s. 101 of the Companies Law).

In the Cayman Islands, insolvency law and practice assumes that, in the ordinary case, most creditors are foreigners and the law and practice is deliberately designed to facilitate their claims. It is very common for creditors of Cayman Islands companies to be located in the United States and such creditors are not discriminated against in the claims process. The rules governing the process require the official liquidators to send claim forms to every creditor of the company known to the official liquidators. *See generally* Jones Decl. ¶ 40.

In determining the validity and allowance of claims, the official liquidators, acting in a quasi-judicial capacity, may admit or reject a claim in whole or in part. If such claim is rejected, the official liquidators must send a written statement to the claimant setting out the reasons for the rejection. The claimant may appeal to the Grand Court, requesting the liquidators' decision to be reversed or modified. The official liquidators may argue that the decision on the claim should be upheld by the Grand Court. The Grand Court considers the matter *de novo*. Discovery is allowed. Evidence will be documentary and by affidavit only, in most cases. Further appeals are allowed from the decision of the Grand Court.

As an alternative to proceeding by "proof of debt," in some circumstances a claimant may bring an action in the Grand Court, or request the Grand Court's permission to continue an action that has been filed prior to the petition for winding-up. The Grand Court, upon appropriate request, may grant leave to proceed in a foreign court after balancing all relevant factors. Pursuant to s. 101 of the Companies Law, the Grand Court may impose such terms on the granting of leave on the claimant and/or the official liquidators as it considers fit, and ordinarily it will impose a condition that if the claimant is successful, the claimant must not seek to enforce the judgment without leave of the Grand Court.

Creditors may be actively involved in the liquidation process. Individual creditors have a right to make an application to the Court for direction that the liquidators undertake or refrain from undertaking any particular course of action. The Grand Court may direct meetings of creditors and frequently will establish a creditors' committee. Normally a creditors' committee will have a consultative role but it is possible for the Grand Court to direct that the liquidators may not act without the committee's consent. Committees may also be authorized to retain counsel separately from those retained by the liquidator and for fees to be paid out of the assets of the company as an expense of the liquidation.

Liquidators may convene meetings at which all creditors are entitled to attend and vote either in person or by proxy. Such meetings may be held in any part of the world, and it is even possible for liquidators to hold parallel meetings in separate countries at which identical resolutions are put to the vote. Where the number of creditors is small, a meeting could take the form of a telephone conference call. It is not uncommon for creditors to form ad hoc or standing committees. Sometimes a class or classes of creditors who have interests distinct from other creditors form separate committees or sub-committees. Such committees may or may not include contingent, future or prospective creditors, and, if appropriate, shareholders. The purpose of the committees is to provide a means by which representative claimants may consult the liqui-

dators and/or vice versa concerning the conduct of the liquidation.

■ From a review of the Declaration of Mr. Jones and the statutory provisions attached to his Declaration, it is clear that a liquidation or "winding-up" of a company under Cayman Island law, although not exactly the same as a liquidation under the Bankruptcy Code, is quite similar. It is a court proceeding in a country whose laws are similar to, although not a mirror image of, the Bankruptcy Code. The law and the practice and procedure in the Cayman Islands appears to assure an economical and expeditious administration of the estate, consistent with just treatment of all holders of claims against interests in such estate; protection of claim holders in the United States against prejudice and inconvenience in the processing of claims; prevention of preferential or fraudulent dispositions of property of such estate; and distribution of proceeds of such estate substantially in accordance with the order prescribed by the Bankruptcy Code.

Granting the relief requested and authorized under 11 U.S.C. § 304(b) is consistent with the concept of comity. Although it is true that certain actions by the Joint Liquidators may need to be undertaken in the United States courts, and that certain actions by some United States creditors may need to be taken through court proceedings in the Cayman Islands, such facts do not require the court to deny the Joint Liquidators the requested relief.

Dealing directly with Ms. Hoffman's claim, and that of others similarly situated, the Cayman Islands procedure allows consideration of her claim once liquidated. At the moment, the copy of the draft complaint she has provided to this court indicates that she purchased a VSC which was not honored by the dealer making the repairs or by the administrator. Pursuant to the terms of her VSC, she may have a direct claim against National Warranty. If she does, Cayman Islands laws provide for the direct, liquidated claim to be submitted for adjudication by the Joint Liquidators. If portions of her claim are unliquidated or contingent, such as the tort claims asserted in the draft complaint, there appears to be a procedure by which she can request the Cayman Islands Grand Court to allow her to proceed in a forum in the United States to liquidate such claim. Whether the Cayman Islands law recognizes class action lawsuits or not, or whether the Grand Court will or will not entertain her request to proceed in the State of Nevada with a request for class action certification, is a matter best left to the discretion of the Grand Court. Just as she has no guarantee of success on such a request to the Grand Court, she has no guarantee of success in obtaining class action certification even if this court somehow assumed jurisdiction and authorized her to institute such a proceeding in the courts of the State of Nevada. The procedure in the Grand Court of the Cayman Islands is not significantly dissimilar from the procedure which a claimant would be subject to if a Chapter 11 or Chapter 7 case were to be filed by National Warranty in a state of the United States other than the State of Nevada. From the point of view of Ms. Hoffman, the forum would be inconvenient and her participation in the bankruptcy proceeding would be expensive, with no assurance that the bankruptcy court would either allow class action status in an adversary proceeding filed in the bankruptcy court or allow Ms. Hoffman relief from the stay to proceed in the Nevada state courts with her attempt at obtaining class action status.

In conclusion, it is appropriate to grant the relief requested by the Joint Liquidators and make permanent the terms of the temporary restraining order initially

entered in this case. Therefore, the substantive terms of the temporary restraining order entered on June 20, 2003, at Filing No. 7 are incorporated herein and made a part hereof, as if herein fully set out. A separate order containing all such substantive terms may be entered upon request of the Joint Liquidators. All issues concerning the rights of parties holding or claiming against "reserves" which are not in the possession of National Warranty, and which are the subject of various objections timely filed, will be dealt with at a separate hearing and by separate order.